**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS UNION OF PUBLIC HOUSING TENANTS, FALL RIVER HOUSING JOINT TENANT COUNCIL, BORDER WORKERS UNITED, ALFRED E. SMITH RESIDENT ASSOCIATION, INC.,<br><br>and<br><br>JANE DOE #1, JANE DOE #2, and JANE DOE #3, together with all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development, MICHAEL R. BANKS, in his official capacity as the Region I Administrator for HUD, and THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,<br><br>Defendants. | Civil Action No. 26-cv-15176<br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs Massachusetts Union of Public Housing Tenants ("Mass Union"), Fall River Housing Joint Tenant Council ("Fall River Tenant Council"), Border Workers United ("BWU"), Alfred E. Smith Resident Association, Inc. ("Smith Houses Resident Association"), Jane Doe #1, Jane Doe #2, and Jane Doe #3, bring this Class Action Complaint against Defendants United States Department of Housing and Urban Development ("HUD"), Scott Turner, in his official capacity as Secretary of Housing and Urban Development, and Michael R. Banks, in his official capacity as the Region I Administrator for HUD, and in support thereof allege as follows:

## INTRODUCTION

1. Plaintiffs bring this action to challenge a rule and interrelated guidance promulgated by Defendants that seeks to eliminate the right of mixed-status families to continue living together in HUD-assisted housing. In addition, the rule and the guidance impose new, onerous and impracticable documentation requirements on all recipients of public housing benefits that will disqualify and/or disrupt benefits to tens of thousands of additional families and many elderly and disabled individuals. Housing and Community Development Act of 1980: Verification of Eligible Status, 91 Fed. Reg. 72,978 (Nov. 12, 2026) (to be codified at 24 C.F.R. pt. 5) (the "Rule"); U.S. Dep't of Hous. & Urb. Dev., Notice SD-2026-01, *Guidance on Continuing to Protect the Meaning and Value of American Citizenship (Executive Order 14418) for Verification Requirements Under Section 214 of the Housing and Community Development Act of 1980 and Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996* (Sept. 4, 2026) (the "Birthright Guidance").

2. For more than 30 years, Section 214 of the Housing and Community Development Act, 42 U.S.C. § 1436a, has provided and continues to provide a statutory framework for families with eligible immigration statuses to access federal public housing and Section 8 vouchers. The statute explicitly authorizes and facilitates prorated financial assistance for mixed-status families, meaning households whose "members include those with citizenship or eligible immigration status, and those without citizenship or eligible immigration status." 24 C.F.R. § 5.504(b).

3. By prorating benefits, Congress has chosen to strike a balance, by allowing those who qualify under Section 214 to access benefits, without also providing financial benefits to those who do not. In so doing, Congress intentionally created a framework that allowed mixed-status families to remain together and raise their children, while maintaining stable housing with prorated financial assistance.

4. In stark contrast to the statutory protections for mixed-status families and longstanding HUD regulations that properly implemented those protections, the Rule would eliminate the existing provisions for prorated federal housing benefits to mixed-status families. The Rule therefore will inflict devastating and irreparable harm on tens of thousands of the nation's most vulnerable families—overwhelmingly families of color, approximately 85%–90% of whom are of Latin American heritage—all in the service of pretextual justifications that (barely) mask discriminatory animus against immigrant communities.

5. The Birthright Guidance amplifies the pernicious consequences of the Rule by requiring citizens and non-citizens alike to quickly produce substantial documentation as a condition to retaining federal benefits. Congressionally mandated appeal rights will also be terminated. The impact of the Birthright Guidance will affect elderly Americans especially hard because they are unlikely to be able to obtain required documents for reasons described below.

6. By HUD's own Regulatory Impact Analysis, the Rule would displace roughly 80,000 people, *including approximately 36,000 eligible children, including U.S. citizen children*, and impose new verification requirements that threaten the housing security of an additional *8.8 million people* currently receiving HUD assistance. *See* U.S. Dep't of Hous. & Urb. Dev., *Regulatory Impact Analysis: Housing and Community Development Act of 1980: Verification of Eligibility Status* (Sept. 30, 2025), https://www.regulations.gov/document/HUD-2026-0199-0006 at 9, 13 (hereinafter "2025 RIA"). The Rule leaves families no real choice because they must either break apart, forcing ineligible members out of the home so that the rest of the family can keep its HUD assistance, or be driven out of assisted housing altogether, at grave risk of homelessness. Families forced out of assisted housing will be thrown into a housing market that is already desperately short of affordable units.

7. The Rule and the Birthright Guidance will also impose crippling costs, exceeding hundreds of millions of dollars annually on existing housing programs, resulting in a reduction of the number of federally assisted dwelling units available to low-income households and a decrease in the quality of the remaining housing. *See* 2025 RIA at 16–19. By HUD's own admission, implementation of the Rule will only exacerbate the current housing crisis that is already devastating families and communities across the United States and worsen conditions for the fully eligible families remaining in HUD's housing programs. *Id.* at 17–18. With fewer units and more displaced families, the Rule will contribute to high rates of homelessness, increasing costs to states and localities.

8. HUD has not offered any credible justification for the Rule or the Birthright Guidance. Nor could it. Contrary to HUD's pretextual justifications in its impact analysis, the Rule does not "bring HUD's regulations into greater alignment with the requirements of Section 214"—rather, it conflicts with the statute in multiple fundamental respects. It will not increase housing assistance for U.S. citizens by preventing them from being "push[ed] aside" by non-eligible tenants, as HUD Secretary Scott Turner claimed in the Rule's announcement. Rather, the Rule will decrease the overall number of families who will receive assistance. It does not "reduce unnecessary regulatory burdens[.]" *See id.* at 6. It instead imposes massive new burdens on tenants, housing authorities, and subsidized landlords. The Rule does not improve housing access. It worsens it.

9. By departing from and conflicting with statutory authority without any credible justification for such a departure, the Rule and the Birthright Guidance are contrary to law and arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). In addition, because HUD adopted the Rule without observing procedures required by

the Regulatory Flexibility Act, the Unfunded Mandates Reform Act, and Executive Order 13132's federalism requirements, HUD's actions constitute a plain violation of the APA, *id*. § 706(2)(D). The Birthright Guidance also constitutes a final agency action that was not subject to proper procedure, including Notice and Comment, in violation of the APA.

10. The Rule and the Birthright Guidance also violate the equal protection and due process guarantees of the Fifth Amendment to the United States Constitution. They are thereby unlawful under the Constitution and under the APA, *id.* § 706(2)(B). By threatening approximately 36,000 eligible children, including U.S. citizen children, with family separation or homelessness, not because of any finding of parental unfitness or danger, but solely because of the immigration status of other members of their household, the Rule and the Birthright Guidance infringe on the fundamental right to family integrity recognized by the Supreme Court. The Rule and the Birthright Guidance, taken together, will have a devastating impact on families. The compressed 90-day compliance timeline, the elimination of appeal rights, the absence of any measures to mitigate harm to mixed-status families, and the overwhelming evidence of discriminatory animus, among other things, demonstrate that the Rule was adopted for constitutionally impermissible purposes.

11. The Plaintiffs in this action respectfully request that this Court: (i) declare the Rule and the Birthright Guidance unlawful, arbitrary and capricious, contrary to federal statutory authority, and inconsistent with the constitutional guarantees of equal protection, due process, and family integrity protected by the Fifth Amendment; (ii) preliminarily and permanently enjoin the Rule and the Birthright Guidance's enforcement and implementation; (iii) certify an injunctive class under Fed. R. Civ. P. 23(a) and (b)(2) and provide relief to the class so certified; (iv) stay

and/or delay the implementation of the Rule and the Birthright Guidance under 5 U.S.C. § 705; and (v) vacate the Rule and the Birthright Guidance pursuant to 5 U.S.C. § 706.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the APA, 5 U.S.C. § 551 *et seq.* and 5 U.S.C. § 702, and the Department of Housing and Urban Development Act, 42 U.S.C. § 3531 *et seq.* Because this is a suit against the United States government to redress the deprivation of rights, privileges, and immunities secured by the U.S. Constitution, jurisdiction is further proper pursuant to 28 U.S.C. § 1343. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706.

13. Venue is appropriate under 28 U.S.C. § 1391(e)(1)(C) because Plaintiff Jane Doe #1 resides in Massachusetts, and because Plaintiffs Massachusetts Union of Public Housing Tenants and Fall River Housing Joint Tenant Council are both incorporated in Massachusetts and have offices in Boston and Fall River, Massachusetts, respectively. Both organizations also serve affected members who are residents of Massachusetts. No real property is involved in this action. In addition, venue is appropriate under § 1391(e)(1)(A) because Defendant Michael Banks resides in Massachusetts and his primary duties are conducted in HUD's Boston office.

## PARTIES

### A. Plaintiffs

14. Plaintiff Massachusetts Union of Public Housing Tenants is a non-profit membership organization organized under the laws of the Commonwealth of Massachusetts with a principal place of business in Dorchester, Massachusetts. Mass Union's mission is to advocate for the rights and interests of public housing tenants by providing education, organizing residents,

and promoting policies that protect affordable housing and tenant rights. Its members are local subsidized housing tenant councils, many of which are elected to represent all public housing tenants in a particular city, town, or development. Together, Mass Union's members collectively represent thousands of Massachusetts subsidized housing tenants, including more than 600 mixed-status families currently living in HUD-assisted dwelling units. Mass Union is led by a democratically elected board composed entirely of public housing residents.

15. Plaintiff Fall River Housing Joint Tenant Council is a non-profit membership organization organized under the laws of the Commonwealth of Massachusetts with a principal place of business in Fall River, Massachusetts. Fall River Tenant Council's mission is to advocate for the rights and well-being of public and affordable housing residents by providing tenant support, community organizing, leadership development, and access to resources. Fall River Tenant Council's members include the residents of public housing operated by the Fall River Housing Authority as well as participants in the Fall River Housing Authority's Housing Choice Voucher program, including mixed-status families in HUD-assisted units. Fall River Tenant Council is led by a democratically elected board composed entirely of Fall River Housing Authority residents. Fall River Tenant Council is a member of Mass Union.

16. Plaintiff Border Workers United is a non-profit membership organization organized under the laws of the State of Texas with a principal place of business in Weslaco, Texas. BWU is grassroots led with an active membership of about 800 members, nearly 98% of whom are Latino from Latin American countries, principally Mexico. The vast majority of BWU's members are mixed-immigration status families. BWU's mission is to foster leadership development for low-income workers and to build a movement for a just and equitable border region. BWU empowers workers to become active participants in shaping policies that affect them. Ensuring that workers

and their families have access to stable and affordable housing is critical to BWU's mission. Since 2025, BWU's work has increasingly focused on addressing palpable fear in immigrant communities because of sprawling immigration enforcement. BWU conducts monthly Know Your Rights sessions, leadership development training, capacity-building, community mobilization, and policy advocacy workshops for its members.

17. Plaintiff Alfred E. Smith Resident Association, Inc. is a non-profit membership organization organized under the laws of the State of New York, with a principal place of business at 17 Saint James Place, New York, New York 10038. Smith Houses Resident Association's mission is to promote the public good through programs designed to improve the living, recreation, education and cultural environment of and neighborhood relationships between community residents in the Alfred E. Smith Houses ("Smith Houses") and surrounding communities. Its members are authorized residents of Smith Houses aged 18 and over. Smith Houses Resident Association's members represent the 1,876 households of Smith Houses, including 16 mixed-status households currently residing in Smith Houses. Smith Houses Resident Association is led by a democratically elected board composed of Smith Houses public housing residents.

18. Plaintiff Jane Doe #1 is a foreign-born resident of the United States who has lived in the United States since 2015. She is currently authorized to live and work in Massachusetts, but her current immigration status is not among the categories of eligible immigration status under Section 214. Jane Doe #1 resides in Massachusetts, with her four children, all of whom are age 12 or under. Her oldest child has the same immigration status as Jane Doe #1. Her three younger children were born in the United States and are U.S. citizens. The family lives together in an apartment with the assistance of a Section 8 subsidy. Jane Doe #1 proceeds by a pseudonym to protect her and her family's privacy.

19. Plaintiff Jane Doe #2 is a citizen of Honduras who has lived in the United States since 2009. She has been authorized to live and work in the United States since she was granted U nonimmigrant status in 2022, a status that is not among the categories of eligible immigration status under Section 214. Jane Doe #2 resides in New York, with her husband, a U.S. lawful permanent resident, and their three minor daughters, ages 16, 15, and 12, all of whom were born in the United States and are U.S. citizens. For nine years, the family has lived in a HUD-assisted project-based Section 8 apartment. Jane Doe #2's household identifies as Hispanic or Latino. Jane Doe #2 proceeds by a pseudonym to protect her and her family's privacy.

20. Plaintiff Jane Doe #3 is a foreign-born resident of the United States who lives and works in the United States. Her current immigration status is not among the categories of eligible immigration status under Section 214. Jane Doe #3 resides in Pennsylvania with her five children, all of whom are U.S. citizens, in a dwelling unit subsidized by a Section 214-covered program. Jane Doe #3 proceeds by a pseudonym to protect her and her family's privacy.

**B. Defendants**

21. Defendant U.S. Department of Housing and Urban Development is an agency of the United States government within the meaning of 5 U.S.C. § 552(f). It is charged with administering a variety of federally funded programs and funding sources. It also is responsible for ensuring that federal programs and activities relating to housing and urban development affirmatively further fair housing. HUD issued the Rule and is responsible for its implementation and enforcement.

22. Defendant Scott Turner is the Secretary of Housing and Urban Development. Secretary Turner is responsible for overseeing all HUD operations, including the promulgation of regulations, the development and implementation of programs, and compliance with and

enforcement of governing statutes, including the Fair Housing Act ("FHA"). This suit is being brought against Secretary Turner in his official capacity as the Secretary of HUD.

23. Defendant Michael R. Banks is the Region I Administrator for the U.S. Department of Housing and Urban Development. The HUD Region I Administrator is responsible for carrying out HUD's policies within Region I, which includes the Commonwealth of Massachusetts. This suit is being brought against Mr. Banks in his official capacity as the Region I Administrator for HUD.

## FACTUAL OVERVIEW

### I. BACKGROUND

#### A. HUD's Affordable Housing Programs

24. HUD is responsible for national policy and programs that address the United States's housing needs, improving and developing the nation's communities, and enforcing fair housing laws. HUD is responsible for administering and enforcing several federal statutes, including, but not limited to, the U.S. Housing Act of 1937, the Fair Housing Act of 1968, and provisions of the Housing and Community Development Act of 1974. One of HUD's purposes is to help create "a decent home and a suitable living environment for every American family." 42 U.S.C. § 1441; *see also* Department of Housing and Urban Development Act, Pub. L. No. 89-174, § 2, 79 Stat. 667 (1965) (codified at 42 U.S.C. § 3531).

25. To that end, HUD has, at all relevant times, administered a variety of subsidized housing programs for low-income families. The most significant of these are (i) public housing, (ii) subsidized multifamily housing, and (iii) housing choice vouchers, each of which is authorized under the agency's statutory authority.

26. HUD's public housing program provides federal funds to state, local, and tribal "public housing agencies" to develop and operate affordable housing. Tenants' rents are subsidized and generally capped at 30% of household income. *See* 42 U.S.C. §§ 1437a(a)(1), 1437g.

27. Under the subsidized multifamily housing program, often called "project-based Section 8," HUD contracts with private entities to develop and operate affordable housing complexes. In these complexes, tenants' rents are also subsidized and subject to the 30% cap. *See id.* §§ 1437a(a)(1), 1437f.

28. The housing choice voucher program is a "tenant-based" assistance program, through which HUD provides funding to state and local public housing agencies, which in turn issue vouchers that low-income families use to rent housing on the private market. Families generally pay about 30% of their income toward rent, and the vouchers cover the rest. *See generally id.* § 1437f(o).

29. Nationally, HUD's housing programs provide or fund housing for approximately 8.8 million people across approximately 4.4 million households. *See* Ctr. on Budget & Pol'y Priorities, *Administration Plan Targeting Immigrants Would Take Away Rental Assistance, Create New Barriers* (Dec. 12, 2025) ("CBPP Report") at 11. Of the approximately 8.8 million people in HUD-assisted households who would be subject to the new citizenship documentation requirements, more than 6 million are people of color, nearly 5.5 million are women and girls, over 3 million are children, and more than 2 million have a disability. *See id.* at 7.

## B. Section 214 Eligibility Restrictions and Mixed-Status Family Eligibility

### 1. *Overview of Section 214 and its restrictions.*

30. In 1980, Congress passed Section 214 of the Housing and Community Development Act of 1980 ("Section 214"), and since its passing, its text has mandated prorated housing assistance to "mixed-status families," or families in which only some, and not all, members are

eligible for housing assistance. As set forth below, over the next 15 years, HUD repeatedly tried to issue rules that would have excluded mixed-status families, but Congress, the courts, and affected families successfully pushed back.

31. In 1995, HUD finally adopted a final rule prorating housing assistance, confirming that mixed-status families could live together in subsidized housing while assistance went only to eligible members. Mixed-status families thus pay a higher share of the rent than fully eligible families.

32. Finally, on September 30, 1996, Congress again amended Section 214 to explicitly authorize prorated financial assistance for mixed-status families. *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009-684, 3009-685 (1996).

#### 2. *Congress enacts Section 214 and blocks HUD's efforts to exclude mixed-status families.*

33. As originally enacted by Congress in 1980, Section 214 did not impose substantial restrictions on noncitizen eligibility. However, a year later, Congress amended the statute to enumerate a list of eligible noncitizen categories and to render all other noncitizens ineligible, thereby creating "mixed-status" families. The original categories of eligible noncitizens, briefly summarized, included lawful permanent residents, asylees, refugees, certain humanitarian parolees, and certain lawful temporary residents. Subsequent legislation would later add additional categories of eligible noncitizens, which carry through to the current rule. *See* 42 U.S.C. § 1436a(a).

34. In 1982, HUD proposed a rule that would have barred mixed-status families from residing in public or assisted housing. This proposed rule would have caused "the mandatory eviction of thousands of families [then] residing in federally-subsidized housing [and] the eviction

[or] denial of admission to families which include citizens and properly documented aliens because not all family members can be properly documented[.]" H.R. Rep. No. 100-122, at 49 (1987).

35. Seeking to avoid these harsh outcomes, Congress directed HUD to delay the effective date of its 1982 proposed rule multiple times, including through the Housing and Urban-Rural Recovery Act of 1983, which postponed the rule's effective date until November 30, 1984. Pub. L. No. 98-181, § 474(e), 97 Stat. 1153, 1239 (1983).

36. Without additional action on the issue, in April 1986, HUD proposed a revised rule to implement the noncitizen eligibility restrictions. *See* Restriction on Use of Assisted Housing, 51 Fed. Reg. 11,198 (Apr. 1, 1986). As before, the effective date of this proposed rule was delayed numerous times—the first two times at the request of Congress, and the third by a rider to HUD's 1987 appropriation that prevented the implementation of the rule while Congress considered legislation to revise the verification requirements. *See* Restriction on Use of Assisted Housing, 51 Fed. Reg. 42,088 (Nov. 21, 1986) (delaying the effective date of the rule until at least October 1, 1987).

37. Around the same time, a lawsuit challenged the April 1986 rule. *See Yolano-Donnelly Tenant Ass'n v. Pierce*, No. S-86-0846 MLS (E.D. Cal. Dec. 18, 1986). *Yolano-Donnelly* involved a nationwide class of plaintiffs who would have been eligible for HUD-assisted housing but for the presence of an ineligible adult in the household. The court granted a preliminary injunction to a nationwide class in that case, holding the restrictions raised constitutional concerns in seeking to deprive affected individuals of shelter and the right to live with their families. *See Yolano-Donnelly*, No. S-86-0846 MLS, Mem. & Order at 3 [Ex. A].

38. In 1988, HUD ultimately withdrew this implementing regulation. *See* Aliens; Withdrawal of Restrictions on the Use of Assisted Housing, 53 Fed. Reg. 842 (Jan. 13, 1988).

### 3. *Congress amends Section 214 to protect mixed-status families.*

39. The same year that HUD withdrew its implementing regulation, Congress made extensive amendments to Section 214, which authorized "the continued provision of financial assistance, if necessary to avoid the division of a family in which the head of household or spouse" was a U.S. citizen or eligible noncitizen. Housing and Community Development Act of 1987, Pub. L. No. 100-242, § 825, 101 Stat. 1815, 1860 (1988).

40. In so doing, Congress rejected HUD's regulations implementing the original Section 214, explaining that HUD had "incorrectly interpreted the original Act." The amendments to the Act were "intended to clarify the original intent of Congress *that families in which at least one person is eligible are not disqualified* and that the rules not be applied retroactively." H.R. Rep. No. 100-122, at 50 (1987) (emphasis added); *see also* Housing and Community Development Act of 1987, Pub. L. No. 100-242, § 2, 101 Stat. 1815, 1819 (1988). Instead, Congress intended that "[a]ny family applying for housing assistance in the future and containing any member who is an alien could be eligible to receive housing assistance if at least one member of the family was a U.S. citizen or a legal alien." H.R. Rep. No. 100-122, at 50 (1987).

41. To further ensure that mixed-status families could continue residing within public or assisted housing, Congress also rejected the imposition of burdensome (and in some cases, impossible) documentation and verification requirements on citizens and noncitizens by limiting the Act's documentation requirements to noncitizens under 62 years of age and providing that elderly noncitizens would only have to certify their status. *See id.* at 49; 42 U.S.C. § 1436a(d).

### 4. *HUD and Congress confirm prorated assistance for mixed-status families.*

42. However, the 1988 amendments did not fully resolve this issue about the rights of mixed-status families to receive prorated benefits. Because some mixed-status families did not

have an eligible head of household, but had eligible *children*, these children could be denied federal housing assistance just because their parents were not eligible.

43. In 1995, HUD resolved these concerns and provided further clarity for treatment of mixed-status families in a final rule that allowed for all family members to reside together in HUD-assisted housing. *Restrictions on Assistance to Noncitizens*, 60 Fed. Reg. 14,816 (Mar. 20, 1995). Specifically, it obligated subsidized housing providers to make federal financial assistance available to all mixed-status families, with the amount of assistance prorated to cover only eligible household members. Because family members who did not claim eligibility for federal benefits would automatically be excluded from financial assistance by means of proration, they did not need to provide documentary proof of their status. *See* 60 Fed. Reg. at 14,826.

44. Just months after HUD promulgated the 1995 final rule, Congress amended Section 214 yet again to explicitly authorize prorated financial assistance for mixed-status families regardless of which family members had status for the purposes of Section 214, in line with HUD's framework. *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-684, 3009-685, 3009-687 (1996). Under this framework, family members who do not claim eligibility—so-called "non-contending" members because they do not contend they are eligible for assistance—may live with their eligible family members without documenting their status, while housing assistance is calculated only for the eligible members. This is known as the "do not contend" mechanism.

45. Specifically, Congress's 1996 amendments included two key provisions: (i) implementing the "do not contend" mechanism described above, i.e., providing that financial assistance to families with at least one eligible member and other non-eligible members would be prorated based on the number of eligible members (42 U.S.C. § 1436a(b)(2)); and (ii) explicitly

authorizing non-contending individuals to reside in federally assisted housing with their eligible family members, so long as the amount of financial assistance to the household was prorated (*id.* § 1436a(d)(6)).

46. In 1996, HUD promulgated an interim rule to conform its regulations with Congress's 1996 amendments to Section 214 described above. *See* Revised Restrictions on Assistance to Noncitizens, 61 Fed. Reg. 60,535 (Nov. 29, 1996) (interim rule) (to be codified at 24 C.F.R. pt. 5). In response to a provision in the interim rule allowing a housing authority to "opt out" of HUD's requirements for noncitizen eligibility, Congress added new language to Section 214 in 1998 authorizing public housing agencies to not affirmatively verify eligibility before providing assistance. *See* Use of Assisted Housing by Aliens, Pub. L. No. 105-276, 112 Stat. 2653 (1998). In so doing, Congress left both core components of the mixed-status families rule—i.e., "do not contend" and proration of financial assistance—undisturbed.

47. HUD subsequently promulgated a final rule in 1999 to implement the 1998 amendment to Section 214. *See* Revised Restrictions on Assistance to Noncitizens, 64 Fed. Reg. 25,726 (May 12, 1999). The 1999 final rule, like the 1998 amendment itself, left the rules governing mixed-status families materially unchanged.

48. In the intervening years, Congress has not taken any action to eliminate, diminish, or materially alter the mixed-status families framework.

**C. Mechanics of the Existing Mixed-Status Families Framework**

49. Since 1995, HUD's eligibility regulations have required applicants to submit declarations of eligibility to the "responsible entity," which means the public housing authority or subsidized owner administering the housing program. *See* 24 C.F.R. § 5.508(c). The rules for such submissions differ for citizens, noncitizens under the age of 62, and noncitizens age 62 and over.

50. U.S. citizens are only required to provide a declaration of citizenship to obtain benefits. HUD, public housing agencies, and subsidized owners retain the discretion to request additional documentation of citizenship, if necessary. *See id.* § 5.508(b).

51. Noncitizens age 62 and over only need to provide a signed declaration of eligible status and documentation of age to obtain benefits. *Id.* § 5.508(b)(2).

52. Noncitizens under the age of 62 must supply additional supporting documentation, including immigration documents establishing eligible status and a signed consent form for the responsible entity to verify the individual's eligibility through the SAVE system. *See id.* § 5.508(b)(3). If the SAVE query does not verify eligible immigration status, the responsible entity must request a "secondary verification," which involves a manual search of Department of Homeland Security ("DHS") records by DHS staff to verify the individual's immigration status. *See id.* § 5.512(c)–(d). If the secondary verification does not confirm eligible immigration status, the responsible entity must notify the family of the family member's ineligibility and of the right to appeal the determination to DHS within 30 days. *See id.* § 5.512(d)(3); *see also id.* § 5.514(e). Section 214 prohibits HUD from denying or delaying financial assistance during the pendency of an appeal. *See* 42 U.S.C. § 1436a(d)(4)–(5); *see also* 24 C.F.R. § 5.514(b).

53. Critically, pursuant to statute, non-eligible individuals may live in HUD-assisted units with their eligible family members by electing not to contend eligibility. *See* 24 C.F.R. § 5.508(e). While a family must identify such members to the responsible entity (for purposes of proration of assistance), no additional documentation is necessary. *Id.*; 24 C.F.R. § 5.520(a) ("An eligible mixed family who requests prorated assistance must be provided prorated assistance.").

54. HUD provides specific methods for calculating the rate of proration in different programs under its regulations (24 C.F.R. § 5.520(b)), but as a general matter proration is based on the proportion of eligible household members to the total number of members of the household.

55. Current HUD regulations provide that "[f]or each family member, the family is required to submit evidence of eligible status only one time during continuously assisted occupancy under any Section 214 covered program." *Id.* § 5.508(g)(5).

### D. Promulgation of the Rule and the Birthright Guidance; Departure from the Mixed-Status Families Framework

56. Despite the above-described statutory provisions and framework, on May 10, 2019, during President Trump's first term, HUD proposed a rule substantially similar to the Rule that targeted mixed-status families (the "2019 Proposed Rule"). Like the Rule, the 2019 Proposed Rule tightened immigration-status requirements for HUD-assisted housing by conditioning a family's housing assistance on every member of the household establishing eligible status and threatened to force affected families either to separate or lose housing assistance. Ultimately, the 2019 Proposed Rule was not finalized. Instead, HUD withdrew the 2019 Proposed Rule in April 2021. As HUD later explained, the 2019 Proposed Rule "would have led to thousands of mixed-status immigrant families that have family members who are undocumented or otherwise be deemed ineligible for public and other subsidized housing [which] would have caused families throughout the country to split up or be evicted." *See* U.S. Dep't of Hous. & Urb. Dev., HUD No. 22-062, *Fact Sheet: On the 54th Anniversary of the Fair Housing Act, HUD Underscores its Commitment and Progress Toward Advancing Fairness and Equity in Housing* (Apr. 11, 2022), https://archives.hud.gov/news/2022/pr22-062.cfm.

57. However, during President Trump's second term, HUD published a notice of proposed rulemaking on February 20, 2026, titled "Housing and Community Development Act of

1980: Verification of Eligible Status." 91 Fed. Reg. 8,151 (Feb. 20, 2026). As with the 2019 Proposed Rule, the 2026 proposed rule would fully dismantle and end the mixed-status families framework by eliminating the "do not contend" option under HUD rules, requiring SAVE verification of citizenship or eligible immigration status for all residents of HUD-assisted housing, and effectively eliminating prorated assistance.

58. HUD provided a 60-day comment period for the proposed rule, which ended on April 21, 2026. In that time, the proposed rule received 16,238 comments, the vast majority of which heavily opposed the rule.

59. After the comment period ended, on September 4, 2026, HUD issued the Birthright Guidance, pursuant to which a U.S.-born resident claiming citizenship must now submit an "Eligibility Attestation" supported by both separate proof of citizenship and identity through certain qualifying documents. Certain documents, such as passports, are considered "Category A" documents, which are sufficient on their own. Otherwise, a person will need a combination of at least one "Category B," one "Category C," and at least one "Qualifying Parent Document" showing that either the resident's mother or father was a U.S. citizen. Birthright Guidance at 3–6.

60. While a passport is considered "Category A," a birth certificate is now considered "Category B," which means a resident relying on a birth certificate now needs a "Qualifying Parent Document," which is most likely to be a parent's birth certificate. For an elderly U.S. citizen subsidized tenant who does not have a passport and whose parents have died or are otherwise unavailable, complying with this Birthright Guidance will be burdensome and impracticable (if not impossible). Similar problems exist for anyone without a passport who is estranged from their parents.

61. This complicated list of documentation that U.S. citizens now need to provide to prove eligibility will compound the burden of complying with the Rule's documentation requirements. Because this Birthright Guidance did not exist during the comment period, commenters were not able to comment on how the then-proposed Rule would improperly burden U.S. citizens. Had HUD allowed an opportunity to submit such comments, Mass Union would have provided information showing how the Birthright Guidance would further exacerbate the effects of the mixed-status rule on HUD-assisted tenants. It is likely that many other persons and entities would have submitted similar comments as well.

62. Notwithstanding the significant opposition, HUD issued the Rule on November 12, 2026 without materially altering any of the proposed rule's core provisions. *See* 91 Fed. Reg. 72,978. HUD's substantive changes were principally (i) extending by 30 days, to 60 days total, the period in which a responsible entity may grant a family additional time to obtain evidence of eligible status for a family member who has contended eligibility; (ii) requiring persons claiming U.S. citizenship to disclose a Social Security number, and aligning the timing of that disclosure with the submission of citizenship evidence; (iii) requiring that the verification consent form comply with Section 7 of the Privacy Act of 1974; and (iv) adjusting the deadline for new family members to submit evidence. *See id.* None of these changes address the elimination of the "do not contend" option, the time-limiting of prorated assistance, or the resulting displacement of mixed-status families.

63. HUD's stated justifications for the Rule are to:

- "bring HUD's regulations into greater alignment with the wording and purpose of Section 214;"

- conform with Executive Order 14218, which directs agencies (including HUD) to "enhance eligibility verification systems, to the maximum extent possible, to ensure that taxpayer-funded benefits exclude any ineligible alien;" and
- "make the verification process more uniform across the tenant population."

64. The effective date for the Rule is December 14, 2026.

65. The Birthright Guidance is effective as of its date of issuance, September 4, 2026. However, by its terms the Birthright Guidance applies "only when the [responsible entity] needs to verify U.S. citizenship." Birthright Guidance at 3. Since responsible entities are not required to verify U.S. citizenship until the mixed-status rule takes effect, the Birthright Guidance is set to spring into effect at the same time as the mixed-status rule.

## II. THE RULE AND THE GUIDANCE VIOLATE THE ADMINISTRATIVE PROCEDURE ACT

66. The Rule violates the APA in multiple respects. It is contrary to law and in excess of Defendants' statutory authority, and arbitrary, capricious, and an abuse of discretion. *See* 5 U.S.C. § 706. The Birthright Guidance also violates the APA because it was issued without following notice-and-comment procedures. *See id.*; 5 U.S.C. § 553(b).

### A. The Rule and the Birthright Guidance Conflict with Section 214 and Its Framework and Exceed Defendants' Statutory Authority

67. The Rule contains provisions that are in plain contravention of law and conflict with Section 214 and the mixed-status families framework.

68. ***First***, the Rule directly contravenes the plain language of Section 214. Congress provided that financial assistance "shall be prorated" to mixed-status families—mandatory language that HUD lacks authority to override by regulation. 42 U.S.C. § 1436a(b)(2). Congress also expressly authorized non-contending individuals to reside in HUD-assisted housing with their eligible family members. *Id.* § 1436a(d)(6). The legislative history confirms that Congress enacted

these provisions specifically to ensure "that families in which at least one person is eligible are not disqualified" from federal housing assistance. H.R. Rep. No. 100-122, at 50 (1987). The Rule nullifies these statutory protections by requiring all household members to verify eligibility—a requirement that Congress specifically rejected. A regulation that contradicts the plain statutory text exceeds the agency's authority and is not in accordance with law.

69. ***Second***, the Rule effectively eliminates the statutory right of mixed-status families to live together under HUD housing programs by eliminating a household member's right to elect not to contend eligible immigration status. 42 U.S.C. §§ 1436a(b)(2), (d)(6); *see also* 24 C.F.R. § 5.508(e). Instead, all household members must declare and document their eligibility or face exclusion from HUD-assisted housing.

70. ***Third***, the Rule ignores Section 214's express carveout for mixed-status families from the general rule that prohibits knowingly permitting ineligible persons to reside in subsidized dwellings, thereby reading this provision out of Section 214 entirely. *See* 42 U.S.C. §§ 1436a(b)(2), (d)(6).

71. ***Fourth***, the Rule is inconsistent with the statute and changes HUD's regulations with respect to SAVE verifications by requiring *all* HUD tenants to sign SAVE verification consent forms, irrespective of citizenship or age. 91 Fed. Reg. at 73,026 (to be codified at 24 C.F.R. §§ 5.508(b)(1)(iv), (d)(1)); *see also id.* at 73,028 (to be codified at 24 C.F.R. § 5.512(c)). The Rule is therefore inconsistent with 42 U.S.C. § 1436a(d)(2)-(3), which statutorily delineates verification requirements, and limits those requirements for U.S. citizens and benefit recipients over age 62. This new provision was included in the Rule, in contravention of the statute and without substantial or reliable evidence that HUD-assisted housing residents have falsely claimed U.S. citizenship or age-related eligibility at any meaningful rate.

72. ***Fifth***, the Rule radically transforms the secondary verification procedure that applies if SAVE fails to confirm eligible immigration status for noncitizens as well as for those U.S. citizens who are, for the first time, subject to the Rule (and who are deemed ineligible). Rather than requiring DHS to conduct a manual search of its records, the Rule simply provides for the responsible entity to conduct a second SAVE search within 30 days after the first attempt at verification. The Rule also eliminates the statutorily mandated DHS appeal process and instead permits only a meaningless "informal hearing" with the responsible entity, even though the responsible entity is bound by the SAVE result. These provisions violate the plain language of 42 U.S.C. § 1436a(d)(4)–(5) concerning how eligibility disputes must be processed.

73. ***Sixth***, the Rule eliminates HUD's current "one-time evidence requirement for continuous occupancy" and requires families to "immediately notify and submit evidence of the new citizenship or eligible immigration status to the responsible entity" if a family member's citizenship or immigration status changes during occupancy. 91 Fed. Reg. at 73,027 (to be codified at 24 C.F.R. § 5.508(f)(5)). This means that, despite the fact that Section 214 does not authorize such a continuing obligation, family members may need to navigate the eligibility verification process multiple times during a tenancy and could potentially face termination of assistance in the middle of a lease. The Rule contains no provisions for transitioning such a tenant to other affordable housing or for compensating a landlord whose tenant loses assistance under such circumstances.

74. ***Seventh***, the Rule requires private owners of HUD-assisted housing to "inform DHS immediately whenever personnel determine that any member of a household is present in the United States in violation of the Immigration and Nationality Act." 91 Fed. Reg. at 73,027 (to be

codified at 24 C.F.R. § 5.508(e)(2)(vi)). No statute authorizes HUD to require subsidized owners to make such reports.

75. The Birthright Guidance is inconsistent with Section 214 to the extent that it facilitates and implements the provisions of the Rule that exceed statutory authority, including, without limitation, by requiring U.S. citizens to produce new and often unavailable documentation (such as, in some circumstances, identity documents for one or more of their *parents*) in order to demonstrate their eligibility.

### B. The Rule and Guidance Violate Due Process Rights and Are Arbitrary and Capricious for Reasons Including Their Drastic Monetary and Societal Costs

76. HUD adopted the Rule and the Birthright Guidance without giving due consideration to their harsh impacts, which include: (i) the rapid, mass displacement of mixed-status families; (ii) the associated pressure that will be placed on affordable housing resources, homeless shelters, and other emergency services; and (iii) the increased costs and impossible burdens arising from new documentation and verification requirements.

#### 1. *Displacement of Mixed-Status Families and Family Separation*

77. As HUD's own Regulatory Impact Analysis estimates, there are about 20,000 mixed-status families that receive prorated benefits through HUD's three flagship low-income housing programs—public housing, subsidized multifamily housing, and housing choice vouchers. 2025 RIA at 48. The families comprise nearly 80,000 individuals, about 70% of whom are eligible for and receive financial assistance. *Id.* at 14, 48. There are over 36,000 eligible children in mixed-status families. *Id.* at 13 n.26. Nearly all of the children in mixed-status families who are receiving prorated benefits under Section 214 are U.S. citizens or eligible noncitizens and live with parents or other adults who do not have eligibility. *Id.* The Rule and the Birthright Guidance put the

integrity of those families at risk and undermine the health and safety of children, whether or not they are U.S. citizens.

78. The protection of family integrity is a bedrock principle recognized by Congress, agencies, and the courts: Congress and HUD have long recognized and safeguarded that, *see supra* ¶¶ 32–47, family integrity is deeply ingrained in the United States, and the Supreme Court has held that the right to reside as a family is a liberty "deeply rooted in this Nation's history and tradition." *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977). For more than a century, the Court has also affirmed the "fundamental liberty interests" that parents have "in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion); *see Meyer v. Nebraska*, 262 U.S. 390, 400 (1923).

79. By conditioning ongoing housing assistance on the verification of the eligibility of all family members or removal of ineligible family members, the Rule and the Birthright Guidance compel mixed-status families to face the impossible choice of either giving up their HUD-subsidized housing or self-evicting members who are unable to establish eligibility. Accordingly, if it goes into effect, the Rule will infringe on the constitutional rights of families to cohabitate and for parents to care for and raise their children.

80. Should a mixed-status family choose to self-evict members who are not eligible, the eligible members of those families who remain in HUD-assisted housing will suffer family separation and its short- and long-term effects. For the approximately 70% of mixed-status families composed of eligible children and at least one ineligible parent, this means that one or both parents could be forced from the home, severing the parent-child bond.

81. The profound impact of family separation has been well documented. Family separation, even in the short term, is distressing, traumatic, mentally and physically damaging, and

disruptive to the child-parent bond. Many parents struggle to restore the parent-child bond once it has been disrupted by a separation. In the long-term, family separation can significantly impact the development and educational attainment of affected children. Children who are separated from their parents often experience disruptions in learning, diminished academic performance, and setbacks in language acquisition and social development. These educational harms often compound over time. *See, e.g.*, H. Li et al., *Association of Early Parent-Child Separation with Depression, Social and Academic Performance in Adolescence and Early Adulthood: A Prospective Cohort Study*, 18 Child Adolescent Psychiatry and Mental Health 78 (2024), https://doi.org/10.1186/s13034-024-00769-1.

82. The physical health impacts of forced family separation are equally severe. Separated children frequently exhibit somatic symptoms including sleep disturbances, appetite changes, weakened immune function, and regression in developmental milestones such as toilet training and speech. The toxic stress that is induced by separation has also been linked to long-term health consequences, including increased risk of chronic disease, cardiovascular problems, and diminished life expectancy. *See, e.g.*, Sara B. Johnson et al., *The Science of Early Life Toxic Stress for Pediatric Practice and Advocacy*, 131 Pediatrics 319 (2013), https://doi.org/10.1542/peds.2012-0469.

83. The outcomes are no better for mixed-status families who refuse to let HUD's policies impinge on their constitutional rights and instead are forced to give up their HUD-subsidized housing in order to stay together. HUD estimates that the vast majority of families will select this "option," which will ultimately result in a significant number of families and individuals seeking new housing options. *See* 2025 RIA at 13–14. HUD accordingly estimates the Rule will displace at least 62,000 individuals in these mixed-status families. *See id.* at 14.

84. The displaced families and individuals will be without housing in the midst of the present housing crisis.

85. The National Low Income Housing Coalition has estimated that there are only 35 affordable and available rental homes for every 100 extremely low-income renter households (i.e., those with incomes at or below either the federal poverty guideline or 30% of their area median income, whichever is greater). Nat'l Low Income Hous. Coal., *The Gap: A Shortage of Affordable Homes* 13 (2026). As a result, more than 7.2 million households already lack access to affordable homes. *Id.* at 11. Implementing the Rule will increase this figure and force displaced families into an overheated rental market where unsubsidized rents are far beyond their means.

86. Displaced mixed-status families are also extremely unlikely to locate alternative income-restricted housing or requalify for federally assisted housing after ineligible members obtain a qualifying immigration status, given that the nationwide affordable housing shortage has produced years-long waiting lists for virtually every form of such housing. If and when the Rule terminates these families' housing benefits, this loss is not merely a temporary setback; it results in the loss of a resource that cannot realistically be replaced for years, if at all.

87. Before promulgating the Rule, HUD failed to adequately consider the above costs associated with the likely displacement of mixed-status families.

88. In addition, HUD greatly underestimated other costs families would incur to find a new home—such as application fees, security deposits, and other upfront rental housing fees as well as any search costs and incidental expenses (e.g., transportation costs and missed work).

89. Displaced families may also face various secondary effects, such as loss of employment or disruption of educational or medical arrangements. HUD failed to consider the lack of affordable homes for these displaced families in affected communities. Indeed, many

displaced families will be forced to, at best, pay rent they cannot afford or accept substandard conditions, or, at worst, endure bouts of homelessness—which HUD itself acknowledged as a possibility without exploring how many people will experience homelessness, for what length of time, in what form, or in what locations. *See* 2025 RIA at 34.

90. The negative impact of homelessness will be particularly acute for children in mixed-status family households. Family displacement and homelessness often involve dire physical, emotional, and mental consequences, many of which will last a lifetime.[1] Homeless children are more likely to experience developmental delays due to disruptions in schooling or childcare and instability in shelter placements. Levels of clinical depression, anxiety, and behavior problems are similarly higher among homeless children. Students who are homeless are also more likely to change schools more frequently, repeat grades more often, and report worse school experiences. *See* Giselle Routhier, *Voiceless Victims: The Impact of Record Homelessness on Children*, Coal. for the Homeless 5 (Sep. 25, 2012) (noting that children experiencing homelessness "scored approximately six percentile points worse than housed children on both reading and mathematics achievement, controlling for earlier achievement" prior to their shelter stay). Each of these educational impacts will have long-term effects on these displaced children, even before addressing the fact that homeless children are more likely to experience acute and chronic health problems. *Id.* at 4.

[1] *See* J.J. Cutuli & Janette E. Herbers, *Promoting Resilience for Children Who Experience Family Homelessness: Opportunities to Encourage Developmental Competence*, 16 Cityscape: A Journal of Policy Development and Research 113, 116 (2014); Allison H. Friedman-Krauss & C. Cybele Raver, *Does School Mobility Place Elementary School Children at Risk for Lower Math Achievement? The Mediating Role of Cognitive Dysregulation*, 51 Developmental Psychology 1725, 1726–27 (2015); Patricia F. Julianelle & Maria Foscarinis, *Responding to the School Mobility of Children and Youth Experiencing Homelessness: The McKinney-Vento Act and Beyond*, 72 The Journal of Negro Education 39, 42 (2003).

91. Even the families who risk homelessness to avoid separation may still ultimately be forced to separate. Without federal assistance, many families will be forced to rely on homeless shelters, many of which have policies of accepting only certain genders or only allowing younger children to stay with their mothers, thereby forcing older children or adult male members to find alternate shelters. *See* Lindsay S. Mayberry et al., *Families Experiencing Housing Instability: The Effects of Housing Programs on Family Routines and Rituals*, 84 Am. J. Orthopsychiatry 95 (2014) 84(1):95–109. As a result, these individuals will suffer the dramatic consequences described above under both scenarios, with little to no reprieve in sight.

### 2. *Exacerbation of the Affordable Housing Crisis*

92. Enforcement of the Rule and the Birthright Guidance will also create downstream issues that impact the affordability of housing in this country. The Rule will result in lost rents for owners/landlords and increased administration costs for housing authorities. *See* 2025 RIA at 15, 22–23. Because of the present limit on benefits for non-contending individuals, mixed-status families pay more in rent per family member per year than non-mixed-status families. *See id.* at 36. Replacing mixed-status families with fully subsidized households will therefore cost housing subsidy providers as much as $385 million per year in additional benefits. *See id.* at 19.

93. A significant cost that owners/landlords will face as a result of the Rule and the Birthright Guidance will come from the increase in the number of evictions. In its Regulatory Impact Analysis, HUD underestimated the eviction costs that would flow from the Rule. HUD made the counterintuitive assumption that not "many households with ineligible tenants, especially adults, would choose to actively protest HUD's decision." *Id.* at 33. Rather, families facing displacement into homelessness by the Rule would have every incentive to delay and stave off eviction for as long as possible, such as by exhausting administrative appeals, utilizing full notice periods and contesting evictions in court to the extent of state law legal defenses and counterclaims.

94. HUD stated that it "has not characterized cost savings as a benefit of the rule; rather, through this rule, HUD seeks to reprioritize limited rental assistance toward fully eligible households." 91 Fed. Reg. at 72,995. In the Rule, HUD characterizes the "genuine costs" of the Rule as only "$17–$33 million in largely one-time upfront costs," and dismisses commenters' point that HUD's claimed $218 million in redistributed assistance must be netted against roughly $202 million in lost tenant rent as "a category error." *Id.* At the same time, HUD concedes that maintaining the pre-rule number of assisted family members would require supplemental funding of approximately $311 million to $385 million beyond the transfer from mixed families—an amount that HUD's "default fixed-budget scenario" simply assumes to be zero. *Id.* Yet HUD agrees that "there may be additional administrative costs for responsible entities." *Id.* HUD thus keeps its cost estimate low only by excluding the funding needed to maintain current service levels, and by accepting that, absent that funding, fewer families will be served. *Id.* at 72,983, 72,995, 72,997–98.

95. The increased costs that will be borne by housing authorities and owners/landlords will in turn decrease available resources for remaining tenants. Indeed, HUD's Regulatory Impact Analysis concludes that "the immediate effect would be a reduction in the number of households and eligible persons assisted." 2025 RIA at 17. According to HUD's own estimate, the mixed-status rule currently enables existing HUD resources to serve about 55,100 eligible persons and additionally house about 24,100 non-contending noncitizens—but the transfer costs associated with exchanging those mixed-status families for fully subsidized families will result in a decline such that HUD would serve just 24,100 eligible individuals and zero ineligible individuals:

**Table 3.** ***Estimated Exchange of Housing Assistance***

| | Eligible Persons | Ineligible Persons | Total Persons | Annual Assistance Per Person |
|---|---|---|---|---|
| **From** Mixed Families | 55,100 | 24,100 | 79,300 | $2,700 |
| **To** Fully Eligible | 24,100 | 0 | 24,100 | $7,700 |

*Assuming that all members of mixed families exit assistance of $218 million and that the policy response is limited to reducing households assisted.*

*Id.*

96. In addition to the loss of subsidized apartments and vouchers, many public housing agencies and subsidized owners will need to reduce staffing, maintenance, and administrative functions in response to the drastic costs of the Rule. This will lead to diminished quality of housing and quality of life for substantially all residents of HUD-assisted housing and may lead to further unit losses whether due to deterioration, closure, or withdrawal of properties from HUD programs. *See id.* at 17–18, 25.

97. The requirement for families to update immigration status information after they go into occupancy of assisted dwelling units will also increase the likelihood and incidence of discrimination against voucher holders (which is illegal under various state laws, including in Massachusetts), as the possibility that a family could lose its assistance in the middle of a lease term due to a change in a family member's immigration status may cause landlords to stop participating in the voucher program altogether. And even those landlords who continue to accept vouchers may decline to rent to noncitizens because of the perceived risk that the family's assistance could terminate during the tenancy should authorized status change.

### 3. *Overwhelming Documentation Burdens and Risks*

98. The Rule and the Birthright Guidance impose burdensome new documentation and verification requirements on all HUD-assisted tenants. Within 90 days of the rule taking effect—

i.e., by March 14, 2027—tenants in mixed families who have not previously submitted the required documentation will be required to do so. 91 Fed. Reg. at 73,022. These documentation requirements will be overbroad in their impact, resulting in even some U.S. citizens and eligible noncitizens losing their housing because they do not have and cannot access sufficient documentation of citizenship or eligible status.

99. In particular, the Rule newly requires verification of U.S. citizenship or nationality, or of eligible immigration status for noncitizens age 62 or older, with mixed-family tenants required to submit evidence within 90 days of the Rule going into effect, subject to extensions, and other affected tenants required to submit evidence at their next annual or interim reexamination. 91 Fed. Reg. at 73,027. But an estimated 3.8 million adult citizens lack any form of documentation proving their citizenship, and another 17.5 million cannot readily access such documents. Erik Gartland & Sonya Acosta, *Administration Plan Targeting Immigrants Would Take Away Rental Assistance, Create New Barriers*, at 4 (Dec. 12, 2025).

100. For example, older individuals face many challenges in getting the required kind of documentation, including higher rates of mobility and cognitive impairments (which make it more difficult to physically visit offices or navigate administrative procedures), reduced skill or familiarity with technology and online information systems, and difficulties coming up with the funds to replace these records. *See* Ina Jaffe, *For Older Voters, Getting the Right ID Can Be Especially Tough*, NPR (Sept. 7, 2018), https://www.npr.org/2018/09/07/644648955/for-older-voters-getting-the-right-id-can-be-especially-tough.

101. Even those without such hurdles may still face difficulties obtaining the necessary documents. Some were never issued a birth certificate in the first place, in particular older adults who may not have been born in a hospital. Others have such documentation, but in the form of

birth certificates or other documents that do not reflect their current name or address. *See* 2025 RIA at 28 & n.49 ("A 2024 report by the Brennan Center for Justice at NYU School of Law found that more than 9 percent of American citizens of voting age, or 21 million people, do not have readily available documentary proof of citizenship such as passport, birth certificate, or naturalization papers."). Others may have lost or misplaced these documents—especially those who have experienced housing insecurity or homelessness.

102. The burden of complying with the Rule's documentation requirements has grown substantially since its announcement, because the Birthright Guidance requires residents to now submit an "Eligibility Attestation" supported by separate proof of citizenship and identity—either a Category A document, or a combination of one Category B document, one Category C document, and a "Qualifying Parent Document" showing that either the resident's mother or father was a U.S. citizen. Birthright Guidance at 3–6. These requirements exacerbate the problems described above, as residents will now be tasked with obtaining not only their own documents, but also those of their parents.

103. Even those individuals able to comply with the documentation requirements may incur burdensome fees, particularly as the Rule allows responsible entities (public housing agencies and subsidized owners that administer housing programs) to accept only "original or certified copies of documents." 91 Fed. Reg. at 73,028. HUD-subsidized tenants, due to their low incomes, are especially likely to lack this documentation and to therefore incur the expense of obtaining it (in 2024, the average Section 8 household income was $17,201).[2] *See* USAFacts, *How*

[2] About 12 percent of U.S. citizens with incomes below $25,000 lack proof of citizenship. *See* Brennan Ctr. for Just., *Citizens Without Proof: A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification* (2006).

*Many People Live in Subsidized Housing?*, https://usafacts.org/answers/how-many-people-live-in-subsidized-housing/country/united-states/ (last visited Nov. 18, 2026).

104. Compounding the issue, SAVE verification is notoriously error-prone and has traditionally only been used to verify eligibility of noncitizens. *See* Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, Brennan Ctr. for Just. (July 21, 2025), https://www.brennancenter.org/our-work/research-reports/homeland-securitys-save-program-exacerbates-risks-voters. As a result, it is not yet proven as a reliable means of verifying U.S. citizenship or nationality. This means U.S. citizens and nationals and eligible noncitizens over age 62 who do not submit the required documentation—or who face errors during the verification process through no fault of their own and with limited ability to challenge the verification results—will be displaced within about one year of the Rule going into effect.

105. Instead of meaningfully considering the overwhelming impact and burden that the new documentation requirements place on current and prospective HUD tenants, HUD's stated purpose for the new requirements is to expand DHS's access to the personal data of HUD tenants. *See* U.S. Dep't of Hous. & Urb. Dev., HUD Secretary Scott Turner, DHS Secretary Kristi Noem Establish Partnership to End Illegal Alien Exploitation of Housing Programs (Mar. 24, 2025), https://www.hud.gov/news/hud-no-25-046. Such a purpose, however, is not a relevant consideration for HUD and indeed conflicts with Section 214's requirement that automated verification be conducted in a manner that "protects the individual's privacy to the maximum degree possible." 42 U.S.C. § 1436a(d)(3)(B).

106. At bottom, HUD failed to consider the material and immediate impact that the Rule and the Birthright Guidance will have on some of this country's most vulnerable citizens, including

children. The consequences of this failure, and of the Rule itself, will be severe and, in many cases, irreversible. Absent immediate protection, HUD's actions will threaten and affect tens of thousands of lives. As amplified by the new documentation problems resulting from the Birthright Guidance, hundreds of thousands of eligible benefit recipients will also be irreparably harmed by suspended or canceled benefits.

107. In promulgating the Rule and Birthright Guidance, HUD failed to provide adequate justification for its abrupt reversal of more than three decades of consistent agency policy and failed to consider critical factors that the APA requires agencies to address. These failures independently render the Rule both contrary to law and arbitrary and capricious.

### C. HUD's Inadequate Justification and Failure to Consider Relevant Factors Violate the APA.

108. ***Unexplained Policy Reversal***. Since 1995, HUD has consistently maintained the mixed-status families framework, permitting families with at least one eligible member to receive prorated assistance while allowing ineligible family members to reside in the household without documentation. Congress ratified this approach in 1996 and again in 1998. For over 30 years, HUD has administered its housing programs in reliance on this framework without identifying any systemic problems, fraud, or abuse that would warrant its elimination. The Rule and Birthright Guidance reverse this longstanding policy without providing any reasoned explanation for why the prior framework was inadequate or why HUD's position has changed. HUD has not identified any intervening change in circumstances, new information, or evidence of regulatory failure that would justify abandoning a policy that Congress itself endorsed through subsequent legislation.

109. ***Failure to Consider Reliance Interests***. Approximately 20,000 mixed-status families currently reside in HUD-assisted housing. 2025 RIA at 48. These families have structured their lives—including their employment, their children's schooling, their medical care, and their

community ties—around the reasonable expectation that they could continue to receive prorated housing assistance so long as at least one family member remained eligible. Many families have lived in HUD-assisted housing for years or even decades under the mixed-status framework. HUD did not meaningfully weigh these reliance interests. HUD declared that "reliance interests, however substantial, cannot override HUD's determination of what Section 214 itself permits," and that "commenters' reliance interests cannot supply a basis for retaining a practice the statute does not authorize." 91 Fed. Reg. at 73,016. That reasoning assumes the very conclusion in dispute—that Section 214 forbids the prorated framework Congress itself enacted—and treats reliance as categorically irrelevant. HUD likewise rejected grandfathering existing mixed-status families, even though its own analysis acknowledged that such an approach "would fulfill the objectives of the rule while avoiding the transition costs borne by mixed families," on the sole ground that grandfathering would "delay the transfer of assistance to fully eligible families by more than a decade." 91 Fed. Reg. at 73,016, 73,023. The Rule and the Birthright Guidance provide a limited transition that applies only to families receiving assistance since 1995, no grandfathering for existing families, and no meaningful accommodation for families who relied on the prior rules. HUD's failure to consider the serious reliance interests of affected families renders the Rule arbitrary and capricious.

110. ***Absence of Evidence of Fraud or Abuse***. HUD has not identified any evidence that the existing mixed-status families framework has resulted in fraud, abuse, or the provision of housing assistance to persons who are not entitled to receive it. To the contrary, the existing framework ensures, through proration, that only eligible family members receive financial assistance—ineligible family members are excluded from the subsidy calculation. HUD's own data confirms that mixed-status families pay, on average, more per year than fully eligible families

precisely because their assistance is prorated to exclude ineligible members. *See* 2025 RIA at 36. The Rule purports to address a problem that does not exist: there is no evidence that ineligible persons are receiving housing assistance under the current framework. HUD's asserted justification of "bringing regulations into greater alignment" with Section 214 is contradicted by the statutory text, which expressly authorizes prorated assistance for mixed-status families. *See supra* Section I.B; 91 Fed. Reg. at 73,013.

111. ***Failure to Consider Less Harmful Alternatives***. HUD failed to consider reasonable alternatives that would achieve its stated objectives without forcing the displacement of tens of thousands of families. If HUD's concern were truly limited to verifying eligibility and preventing fraud, it could have: (i) enhanced verification procedures for the initial determination of eligibility without eliminating proration for mixed-status families; (ii) implemented targeted auditing of a sample of households rather than imposing universal verification requirements; (iii) allowed continued use of the "do not contend" option while requiring periodic recertification; or (iv) phased in any new requirements over a reasonable period to allow families to adjust. Public comments submitted during the rulemaking process identified numerous less restrictive alternatives, but HUD dismissed these alternatives without meaningful consideration. HUD's failure to seriously evaluate less harmful means of achieving its stated objectives renders the Rule arbitrary and capricious.

112. ***Inadequate Response to Public Comments***. During the 60-day comment period, HUD received over 16,000 comments, the overwhelming majority of which opposed the proposed rule. *See* 91 Fed. Reg. at 73,020. Commenters—including housing authorities, landlords, advocacy organizations, legal experts, members of Congress, and affected families—raised substantial concerns about: (i) the statutory conflict between the proposed rule and Section 214's express authorization of prorated assistance; (ii) the devastating impact on children, including children

who are U.S. citizens, who would lose housing through no fault of their own; (iii) the lack of evidence of fraud or abuse in the existing system; (iv) the exacerbation of the affordable housing crisis; (v) the unreliability of SAVE verification for U.S. citizens; (vi) the elimination of due process protections including the right to an appeal; (vii) the pretextual nature of the purported justifications for the Rule; and (viii) the disproportionate impact on Latino families. *See id.* at 72,983 (statutory conflict), 72,993 (impact on children), 73,019 (fraud as a pretext), 72,988 (housing crisis), 72,986, 73,002 (unreliability of SAVE verification), 72,987, 73,017 (elimination of due process protections), 73,019 (pretextual justifications), 73,010 (disproportionate impact). HUD issued the Rule without materially changing any of its core provisions in response to these comments. *See id.* at 72,979. And the public's opposition would have been even greater had it been aware what compliance with the Rule would actually require, as the Birthright Guidance now requires U.S.-born residents to prove their citizenship and identity by either submitting a Category A document, or by submitting one Category B document, one Category C document, and a "Qualifying Parent Document" proving the citizenship of one of their parents. HUD's cursory dismissal of significant, substantive objections fails to satisfy the APA's requirement of reasoned decision-making.

113. HUD's responses to the comments confirm, rather than cure, the Rule's defects. HUD acknowledges "commenters' contention that the rule will cost more than it saves," but asserts that "the RIA does not claim net budgetary savings as the rule's justification; rather, it characterizes the principal effect as a transfer of limited assistance to fully eligible households." 91 Fed. Reg. at 73,004. HUD further concedes that replacement households "are expected to require higher levels of subsidy than the mixed families they replace, and that, absent an appropriations increase, the number of persons served would decline," and that the Rule "is unlikely to result in an increase in

HUD's overall budget." *Id.* at 72,997, 73,000. HUD thus admits that the Rule will remove U.S.-citizen children and other eligible family members from their homes in order to serve fewer people at greater cost.

114. In response to comments documenting increased housing insecurity, health harms, local fiscal costs, and homelessness, HUD largely reuses the same boilerplate responses to each issue, varying only the subject: "While the rule may increase the risk of housing insecurity for some currently assisted households that include ineligible members, the assistance that is redirected would allow fully eligible households currently on waiting lists to receive it. Thus, any increase in housing insecurity for affected households that cannot remain in their unit would be counteracted to a certain extent by a decrease in housing insecurity experienced by the fully eligible households who would replace them." *Id.* at 72,996; *see also id.* at 72,996–97 (response to health issues), 73,001 (local fiscal costs), 73,002 (homelessness and Continuum of Care strain). That response is non-responsive and internally inconsistent: HUD simultaneously concedes that fewer households will be served, so any "offset" is necessarily smaller than the harm, and HUD made no attempt to quantify either side of the ledger, instead declaring the net effect on homelessness "ambiguous." *Id.* at 72,997, 73,000.

115. HUD acknowledges that families losing assistance in high-cost markets "may face significant difficulty securing alternative housing," but responds only that responsible entities "are not required to identify or provide such alternatives," and that "the potential lack of comparable affordable housing does not provide a statutory basis for HUD to continue assistance." *Id.* at 73,008, 72,996.

116. HUD's response to the "substantial volume of comments" objecting that the Rule forces families to choose between separation and loss of housing is to deny that the choice exists.

*Id.* at 73,009. HUD asserts that the Rule does "not require any family to separate," and that "[a]ny effect on household composition results from the family's own choices in response to the statutory eligibility restriction, not from a governmental directive to separate." *Id.* at 73,009, 73,018. HUD adds that "[f]amilies may continue to live together, but they may not do so indefinitely while receiving Federal subsidies." *Id.* at 73,018. Yet HUD's own analysis estimates that approximately 16,000 affected families with children—about 78% of affected mixed-status families—will "likely leave assisted housing together rather than separate." *Id.* at 73,009–10, 73,018.

117. In response to comments regarding the costs of homelessness borne by local governments, HUD identified as "a partial offset" that "the cost to U.S. local governments of servicing homeless ineligible households would decrease to the extent displaced individuals leave the United States." *Id.* at 73,001. HUD likewise justified its assumption that only about 5% of affected families would contest eviction on the ground that "concurrent immigration-enforcement actions may prompt ineligible individuals or mixed families to vacate voluntarily rather than contest this rule." *Id.* at 72,997. HUD thus expressly counted the departure of family members from the country, and the deterrent effect of immigration enforcement, among the Rule's effects in its favor.

118. HUD's responses to comments regarding the labor-force and tax contributions of mixed-status households misstate those comments, asserting that commenters "appear to argue that because these households are net fiscal contributors . . . HUD should reconsider this rulemaking to better align regulations with the wording and purpose of Section 214." *Id.* at 73,006–07. Commenters raised these contributions as reasons to withdraw the Rule, not as reasons to tighten it, and HUD's boilerplate restatement did not engage with their actual point. HUD likewise dismissed comments regarding the civic and cultural benefits that mixed-status families bring to

their communities, stating that "such considerations are not material to whether HUD should better align its regulations with statutory requirements." *Id.* at 73,007.

119. HUD's comment responses contain numerous errors reflecting a failure to give genuine consideration to significant comments. For example, (i) in the section of the Rule addressing the Unfunded Mandates Reform Act, HUD's response to comments that the Rule shifts costs to state and local governments does not address unfunded mandates at all, but instead discusses whether an individual may "elect to not contend eligible status," 91 Fed. Reg. at 73,016; (ii) the Rule refers to its own provision as "proposed § 5.512(f)," *id.* at 72,985, indicating that HUD carried over text from the proposed rule without revision; (iii) HUD's response regarding elderly participants states that "primary verification of citizenship is conducted through collection and review of documentation under § 5.508(b)," *id.* at 73,012, contradicting HUD's statements elsewhere that primary verification is conducted through SAVE and that documentation review "will be limited to instances of secondary verification," *id.* at 73,024; *see also id.* at 73,016; (iv) a full paragraph responding to comments on the downstream costs of homelessness is printed twice in succession, *id.* at 72,997–98; and (v) similarly, HUD's Regulatory Flexibility Act discussion in the Rule still "specifically invites comments regarding any less burdensome alternatives to this rule[.]" *Id.* at 73,024.

120. Upon information and belief, the Rule's accelerated finalization followed directly from changes at the White House after the November 3, 2026 midterm elections. On November 9, 2026, six days after the election, Stephen Miller officially became White House Chief of Staff. Mr. Miller has long been publicly identified as the principal architect of the administration's immigration agenda, including policies aimed at restricting immigrants' access to public benefits. Just three days after Mr. Miller took office, and less than 10 days after the election, HUD issued

the final Rule on November 12, 2026. *Id.* at 72,978. The timing suggests that the Rule was finalized to carry out White House immigration-enforcement priorities rather than HUD's own reasoned decision-making. It further supports the inference that President Trump's and his senior advisors' animus toward immigrants of color influenced and manipulated HUD's decision-making process.

121. ***Costs Vastly Exceeding Benefits***. HUD's own Regulatory Impact Analysis demonstrates that the costs of the Rule vastly exceed any purported benefits. HUD estimates that the Rule will: (i) displace approximately 62,000 individuals from HUD-assisted housing (*see* 2025 RIA at 14, 48); (ii) require approximately $311 million to $385 million in supplemental funding merely to maintain the pre-rule number of assisted family members, an amount HUD's "default 'fixed budget' scenario" simply holds "to zero" (*id.* at 19; *see also* 91 Fed. Reg. at 72,995, 72,998); (iii) eliminate approximately $202 million in annual rent payments that mixed-status families currently make (*see* 2025 RIA at 9); and (iv) actually *reduce* the number of eligible persons served by HUD programs (*see id.* at 16–17). According to HUD's own analysis, "the immediate effect would be a reduction in the number of households and eligible persons assisted." *Id.* at 17. HUD likewise concedes that "[a]bsent an increase in appropriations for all covered programs, fewer households would receive housing assistance." *Id.* at 5. HUD has identified no quantifiable benefit that would justify these enormous costs. Instead, HUD disclaims cost savings altogether, stating that it "has not characterized cost savings as a benefit of the rule." 91 Fed. Reg. at 72,995. The Rule's stated objective of "alignment" with Section 214 is not a benefit at all—it is a legal conclusion that is contradicted by the statutory text. *See* 2025 RIA at 6. HUD's failure to identify benefits commensurate with the Rule's documented costs renders the Rule arbitrary and capricious.

122. ***Pretextual Justification***. All of HUD's stated justifications for the Rule and the Birthright Guidance are pretextual. HUD claims the Rule will bring its regulations "into greater alignment with the wording and purpose of Section 214," but this justification is directly contradicted by the statutory text, which expressly provides that assistance "shall be prorated" for mixed-status families and authorizes non-contending individuals to reside in assisted housing. 91 Fed. Reg. at 72,978; 42 U.S.C. § 1436a(b)(2), (d)(6). HUD also claims the Rule will "make the administrative process for verification more uniform for citizens and eligible noncitizens." 2025 RIA at 6. But administrative uniformity cannot justify disregarding the distinct verification requirements Congress expressly prescribed. Section 214 differentiates among U.S. citizens, eligible noncitizens age 62 or older, and eligible noncitizens under age 62. *See* 42 U.S.C. § 1436a(d)(1)(A), (2)–(4). In particular, Congress limited documentation requirements to noncitizens under age 62, provided that elderly noncitizens need only certify their status, and did not subject citizens to immigration-status verification. HUD cannot invoke "uniformity" to erase distinctions that the statute itself draws. In any event, the Rule and the Birthright Guidance do not achieve uniformity; instead, they create new, more complex and non-uniform verification procedures that impose substantial burdens on housing authorities and families alike.

123. Despite the devastating effects of the Rule, it was announced with the jarringly insensitive headline, "Illegals, Ineligibles, and Fraudsters: Pack Your Bags," accompanied by three emojis: a hand waving goodbye, a suitcase, and an airplane and branded the family members of eligible tenants as exploiting a "roommate loophole." Press Release, U.S. Dep't of Hous. & Urb. Dev., HUD No. 26-015, *HUD Moves to Close "Mixed Status Households" Roommate Loophole* (Feb. 19, 2026), https://www.hud.gov/news/hud-no-26-015 (last visited Nov. 18, 2026).

124. Secretary Turner has also described the Rule as "finally ending this gravy train for illegals." Forbes Breaking News, *'We Are Finally Ending This Gravy Train for Illegals': Turner Details New Public Housing Rules,* at 3:49–3:52 (YouTube, Mar. 28, 2026), https://www.youtube.com/watch?v=ScsDtQ1PQ9Q. Yet the so-called "ineligibles" receive no HUD assistance at all, and 86% of the targeted households are Latino. 91 Fed. Reg. at 73,010. HUD's stated rationales—alignment with a statute the Rule contradicts and verification "uniformity" the Rule does not achieve—are pretextual. *See supra* Section II.C (Pretextual Justification).

125. The true purpose of the Rule—to exclude mixed-status families from HUD-assisted housing entirely and thereby to foster their deportation—is further evident from the Rule's design, from the lack of concern about its adverse impacts on families and Latino communities, and from the pattern of anti-immigrant statements by senior administration officials leading up to its promulgation.

126. Agency action based on pretextual reasoning is arbitrary and capricious.

**D. HUD Failed to Follow Established and Mandatory Procedures in Promulgating the Rule and the Birthright Guidance.**

127. The Rule and the Birthright Guidance were not promulgated in accordance with relevant procedures that HUD was required to follow.

128. The Regulatory Flexibility Act requires an agency to prepare an initial regulatory flexibility analysis and make it available to the public. 5 U.S.C. § 604(a)-(b). The analysis must describe the impact of a proposed rule on small entities. This requirement is waived only "if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." *Id.* § 605(b).

129. Defendant Turner certified that the Rule will not have a significant economic impact on a substantial number of small entities, but this certification was facially inadequate because the Rule imposes significant new compliance obligations on housing authorities and subsidized owners—many of which qualify as small entities. *See* 91 Fed. Reg. at 72,984 ("HUD acknowledges that the requirement to verify more individuals' statuses in SAVE will increase administrative burden on responsible entities"). As a result, Defendant Turner's certification is false and cannot lawfully obviate the need for a regulatory flexibility analysis. Because no regulatory flexibility analysis was prepared or made available for public comment, HUD failed to observe the procedures of the Regulatory Flexibility Act.

130. In addition, Executive Order 13132 prohibits an agency from promulgating regulations that impose substantial direct compliance costs on state and local governments unless (i) the statute requires such cost be borne by those entities; (ii) the federal government provides funds for compliance; or (iii) the agency consults with state and local officials early in the process of developing the regulation followed by publishing a federalism impact statement. Exec. Order No. 13132, 64 Fed. Reg. 43,255, 43,257–58 (Aug. 10, 1999). There is no doubt the Rule imposes substantial direct compliance costs on public housing agencies, which are state and local governmental entities, by requiring them to screen and verify the eligibility of U.S. citizens and additional noncitizens in HUD-assisted housing and evict residents who become ineligible. Accordingly, because these activities are not required by statute and no additional funding is provided to carry out the activities, a federalism impact statement is required. As HUD has not prepared or published the requisite federalism impact statement, its actions are in violation of Executive Order 13132.

131. The Unfunded Mandates Reform Act further requires a cost-benefit analysis when a rule imposes federal mandates with aggregate costs exceeding $100,000,000 in a single year. 2 U.S.C. § 1532(a). The Rule imposes federal mandates on public housing agencies and subsidized owners requiring them to screen and verify the eligibility of U.S. citizens and additional noncitizens in HUD-assisted housing and evict residents who become ineligible. Compliance with these mandates may and likely would result in state, local, tribal, and private expenditures over $100,000,000 in a single year. *See supra* ¶¶ 92–95. As a result, because HUD failed to prepare an adequate cost-benefit analysis, its actions violate the Unfunded Mandates Reform Act.

### E. The Birthright Guidance Unlawfully Failed to Follow Notice-and-Comment Rulemaking Procedures.

132. The Birthright Guidance is separately unlawful because it did not follow notice-and-comment procedures (or any APA procedure at all). The Birthright Guidance was final agency action that did not exist during the comment period on the Rule, and the public never had the opportunity to comment on its impact despite the policies going hand-in-hand with the Rule.

133. Because the Birthright Guidance will govern the ability of benefit recipients, including U.S. citizens, to prove their lawful status and right to federal benefits under existing law, it will have an impact on families' ability to receive federal housing assistance. It substantively narrows and impermissibly burdens the rights of benefit recipients, including citizens, to due process and ultimately to receive federal housing benefits. As HUD acknowledges, the Birthright Guidance functions to fill substantive interstices in the Rule. *See* 91 Fed. Reg. at 72,979, 73,009 (stating that HUD "will issue further guidance on acceptable documentation as provided for in § 5.510(b)(6)"); *id.* at 73,028 (§ 5.510(b)(6)). Legislative rules are subject to APA notice and comment procedures.

### F. The Rule and the Birthright Guidance Are Motivated by Impermissible Animus Against Immigrants of Color.

134. Throughout his first and second terms, President Trump has disparaged and demeaned immigrants and expressed a clear intent to limit the number of immigrants from Latin American, African, and Asian countries—the so-called "shithole countries." President Trump's inaccurate and misleading statements, as well as his administration's policies, reflect an anti-immigrant animus based on race, ethnicity, and national origin.

135. For years, President Trump has targeted Latinos with hateful comments. In announcing his first election bid in 2015, President Trump said: "When Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists."

136. Throughout his first term in office, President Trump repeatedly spoke about his disdain for family-based immigration preferences, a system he derogatorily referred to as "chain migration." For example, in a 2019 speech, when referencing Mexico, President Trump stated, "Do you think the country is giving us their finest? No, they're not. No, they're not. They're giving us the opposite of their finest." He then referred to the visa lottery and "chain migration" as "sick, demented laws that we have to change" because "[t]he people that are sent to our country are not the people that we want."

137. More recently, in reference to Venezuelan immigrants in Colorado, President Trump stated, "[T]hey come from the dungeons, think of that, the dungeons of the third world, from prisons and jails, insane asylums, and mental institutions. And [Kamala Harris] has had them resettled beautifully into your community to prey upon innocent, American citizens."

138. During a 2023 rally, President Trump referred to migrants, including those from South America, as "poisoning the blood of our country."

139. Others in the administration have unjustly tied Latino communities to crime, including former DHS Secretary Kristi Noem, who asserted that "Venezuela emptied their prisons and told them to come to America. Far too few have been deported."

140. On March 15, 2025, the administration deported Kilmar Armando Abrego Garcia, a Salvadoran man with no criminal record, because of what a government attorney later acknowledged was an "administrative error." The administration did not publicly acknowledge its mistake or take steps to reverse the deportation. Rather, the Department of Justice attorney who admitted the mistake was placed on administrative leave and the administration continued to frame Abrego Garcia as a "foreign terrorist" and "MS-13 gang member," in open defiance of the Supreme Court and without any evidence.

141. In or around July 2025, the Trump administration constructed and opened what it termed "Alligator Alcatraz," which, in President Trump's own words, was "surrounded by miles of treacherous swamp land, and the only way out is really deportation."

142. President Trump's animus, as reflected through the pattern of anti-immigrant and racist rhetoric, has plainly influenced and manipulated HUD's decision-making process throughout the promulgation of the Rule. For example, in August 2025, HUD implemented an "English-only" policy, removing all non-English materials, flyers, and similar information from its website and offices, except where such non-English materials are specifically required by statute to be available or provided.

143. Secretary Turner, who signed the Rule, has repeatedly directed the same hostility at immigrants in HUD-assisted housing. On November 19, 2025, he posted: "You can't disrespect our laws and enter our country illegally, then steal resources from American citizens. You will be kicked off HUD resources and reported to DHS. We will use every tool in the belt to stop illegal

aliens from abusing taxpayer-backed resources." Scott Turner (@SecretaryTurner), X (Nov. 19, 2025, 08:16 ET), https://x.com/SecretaryTurner/status/1991133515417825599?s=46.

144. On November 24, 2025, he posted: "Illegal aliens have no place in public housing. Entering our country without permission, then taking resources intended for vulnerable Americans will not be tolerated. Memphis public housing will be rid of illegal aliens." In the accompanying press conference, Secretary Turner stated that public housing should serve "[s]pecifically, American citizens. That's who we want to help," and that "[i]t's outrageous that people who should not be here, come across our borders, and now usurp spots in housing units that should support American people."

145. In announcing HUD-DHS data sharing, then-DHS Secretary Kristi Noem warned: "[i]f you are an illegal immigrant, you should leave now. The gravy train is over." *See* U.S. Dep't of Hous. & Urb. Dev., HUD No. 25-046, https://www.hud.gov/news/hud-no-25-046. The 2025 Memorandum of Understanding between HUD and DHS states that its purpose is to "help stem the tide of illegal immigration in the United States and incentivize illegal aliens to voluntarily depart the country," and to "identify illegal aliens who are ineligible for Federal housing assistance and take remedial measures to end this waste and abuse, including referral for immigration enforcement actions."

146. Testifying before the House of Representatives on May 12, 2026, Secretary Turner was asked by Representative Adriano Espaillat what would happen to U.S.-born children whose families were split or removed from their homes under the proposed Rule because of a parent's status. Secretary Turner responded that "families have to make good decisions within the family"; that "[i]f a family is breaking the law and making a decision to do so, then everybody in that family

suffers"; and that "I'm not splitting families up sir, families are making the decision, their own decision, to game the system."

147. These statements by the official who signed the Rule are directed specifically at immigrants in HUD-assisted housing and at the Rule itself, and they mirror the Rule's own reasoning, which treats the departure of family members from the United States, and the deterrent effect of immigration enforcement, as considerations favoring the Rule.

148. Where, as here, HUD's actions are plainly influenced, motivated, and manipulated by the directives of those above it, they evidence a clear discriminatory bias against immigrants of color.

149. These concerns are not theoretical, as the effects of the Rule will be disproportionately felt by this minority community. The Rule disproportionately impacts Latino individuals, who comprise 86% of people living in mixed-status families. *Gartland & Acosta, supra*, at 3, tbl. 1. The disparate impact is further reflected in the finding that Latino individuals are more than 24 times as likely as non-Latino individuals to lose housing assistance or face family separation. *See* Cal. Civ. Rights Dep't, Comment on Proposed Rule, HUD Docket No. FR 6524, at 5–6 (Apr. 21, 2026).

150. The Rule also comes amid a worsening housing crisis that already falls hardest on Latino households: about 13% of Latino households are extremely low-income renters (compared to 6% of white, non-Latino households), and Latino people accounted for nearly half (48%) of the national increase in homelessness from 2023 to 2024. *See* Nat'l Low Income Hous. Coal., The Gap: A Shortage of Affordable Homes at 4, 10 (2026); *HUD Releases 2024 Annual Homeless Assessment Report*, Nat'l Low Income Hous. Coal. (Jan. 13, 2025), https://nlihc.org/resource/hud-releases-2024-annual-homeless-assessment-report#.

151. In light of the Trump administration's long history of animus towards immigrant groups, particularly the Latino community, and the Rule's significant disparate impact on the Latino community, the Rule fails to abide by a central purpose of the FHA, as articulated by the Supreme Court, to ensure that housing priorities are achieved "without arbitrarily creating discriminatory effects or perpetuating segregation." *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 540 (2015). As a result, by eliminating proration for mixed-status families, the Rule creates discriminatory effects in violation of the FHA.

## III. THE RULE'S IMPACT ON PLAINTIFFS

### A. Organizational Plaintiffs

152. Each of the organizational Plaintiffs—Mass Union, Fall River Tenant Council, BWU, and Smith Houses Resident Association—has standing to bring this action on behalf of its members because its members would otherwise have standing to sue in their own right; the interests it seeks to protect are germane to the organization's purpose; and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

#### 1. *Massachusetts Union of Public Housing Tenants*

153. Plaintiff Mass Union is a membership organization composed of member Local Tenant Organizations ("LTOs").

154. Each Mass Union member LTO represents, and includes as members, all public housing tenants in a particular city, town, or public housing development.

155. Certain Mass Union member LTOs, such as Plaintiff Fall River Tenant Council and the Boston Housing Authority Resident Advisory Board, also represent, and include as members, all households within their jurisdiction who hold vouchers under the Section 8 Housing Choice Voucher (HCV) program.

156. Mass Union, through its members, represents thousands of Massachusetts subsidized housing tenants, including mixed-status families currently living in federally assisted dwelling units.

157. Mass Union's membership thus includes thousands of individuals who will be subject to, and harmed by, the Rule and the Birthright Guidance if they go into effect.

158. For example, one of Mass Union's member LTOs is the Mystic Tenant Association ("Mystic"), which represents all tenant households who reside in the Mystic View federal public housing complex in Somerville, Massachusetts.

159. Mystic's membership includes at least 37 mixed-status families who reside in units at Mystic View.

160. One mixed-status member of Mystic is a family headed by Member A, a noncitizen who does not have an eligible immigration status for purposes of Section 214, and resides in a unit at Mystic View with their minor U.S. citizen child.

161. Member A's minor child has developmental disabilities and is an elementary student in Somerville Public Schools.

162. Member A works as a house cleaner and currently does not earn enough to afford a private market apartment for their family anywhere in (or remotely near) Somerville.

163. If they are displaced from their unit as a result of the Rule and the Birthright Guidance, Member A and their child will have nowhere to go.

164. In addition, Member A's child will experience an interruption of speech therapy and other services they receive to address their developmental needs in school, which will cause them to regress.

165. Another mixed-status member of Mystic is a family headed by Member B, a noncitizen who does not have an eligible immigration status for purposes of Section 214 and resides in a unit at Mystic View with their two children, one of whom is a minor.

166. Member B is currently unable to work for medical reasons, and their oldest child is a full-time student. The family's only current income is a small amount of child support and part-time employment income from Member B's oldest child, which is not enough to afford a private market apartment for their family anywhere in (or remotely near) Somerville.

167. If Member B is displaced from their unit as a result of the Rule and the Birthright Guidance, Member B and their children will have nowhere to go.

168. In addition to being harmed by the likely displacement of its mixed-status membership, Mystic, along with virtually every Mass Union member LTO, will also be harmed because it includes members who are citizens or eligible noncitizens who will be subject to new and needlessly onerous verification requirements.

169. Many of these members, particularly those who are elderly, no longer have access to their birth certificates and do not have passports, meaning that they could not successfully prove eligibility for their housing under the Rule in the event they are required to undergo secondary verification.

170. It is also practically impossible for these individuals to access any Qualifying Parent Documentation contemplated by the Birthright Guidance, such as a parent's birth certificate.

171. Mass Union's member LTOs will also be harmed by the Rule and the Birthright Guidance because they will reduce the number of households who reside in assisted units within the jurisdictions represented by these LTOs, which in turn will reduce LTO membership.

172. This LTO population loss will occur due to the tremendous costs the Rule and the Birthright Guidance will impose upon local public housing authorities that will, in turn, require housing authorities to reduce the number of households they assist within their federal public housing and Section 8 portfolios.

173. Such costs include: a) the decrease in available funding that will occur as housing authorities are required to replace formerly prorated households with families who receive full subsidies; and b) the financial and administrative burdens of reverifying the status of all existing households.

174. A reduction in future membership harms Mass Union member LTOs financially, because: a) these LTOs generate their respective budgets largely from tenant participation funds, which are authorized by Massachusetts and federal regulations to support resident participation in the governance of federally subsidized housing programs; and b) these funds are generally paid to LTOs on a per-unit basis at a rate of $25.00 per represented federal public housing unit.

175. In addition to harming Mass Union's members, the Rule and the Birthright Guidance will also harm Mass Union directly, by interfering with its core mission of building and maintaining tenant organizations in subsidized housing communities across Massachusetts.

176. Among Mass Union's most important regular activities is assisting tenants in their developments to form democratically elected LTOs, including by helping them organize elections.

177. For already-established LTOs, Mass Union provides training and other technical assistance on tenant rights and other matters of concern to public housing residents, so that LTOs are empowered to effectively organize and advocate for what their residents need.

178. The Rule and the Birthright Guidance include numerous provisions that will divert attention and resources of Mass Union staff as well as its member LTOs from those core organizing

activities. In particular, the onerous verification requirements the Rule and the Birthright Guidance impose are likely to swamp Mass Union staff with requests for additional training and technical support, as well as member LTO leadership with requests for individualized assistance from impacted residents.

179. The Rule and the Birthright Guidance will also have a chilling effect upon Mass Union's organizing activities.

180. Specifically, because the Rule and the Birthright Guidance will a) target families for displacement on the basis of their immigration status and b) add new legal requirements (completely untethered from statute) for responsible entities to inform DHS about allegedly undocumented household members, immigrant families will be disincentivized from participating in existing LTOs or in efforts to form new ones.

181. In fact, Mystic leadership has already noticed a decrease in tenant responsiveness and participation, particularly among immigrant families, since the Rule was first published as a proposal earlier this year.

**2. *Fall River Housing Joint Tenant Council***

182. Plaintiff Fall River Tenant Council is the Local Tenant Organization serving public housing residents and voucher-holders within the Fall River Housing Authority (the "Housing Authority").

183. Fall River Tenant Council is a membership-based organization. Its members include all public housing residents as well as all voucher-holders within the Housing Authority's portfolio. Fall River Tenant Council is authorized to negotiate with the Housing Authority as to all matters that impact its members.

184. Fall River Tenant Council's budget is generated almost entirely from tenant participation funds, which are authorized by Massachusetts and federal regulations to support resident participation in the governance of public housing programs.

185. The Housing Authority disburses tenant participation funds to Fall River Tenant Council at a rate of $25.00 per unit per year for units represented by Fall River Tenant Council.

186. The vast majority of the Housing Authority's public housing portfolio is federal—of 23 public housing developments total, 20 are federally assisted.

187. Accordingly, the vast majority of Fall River Tenant Council's members are federal public housing tenants and Section 8 voucher holders who will be subject to the Rule and the Birthright Guidance if they go into effect. Currently, twenty-three mixed-status families are federal public housing tenants of the Housing Authority. Currently, four mixed-status families hold Section 8 Housing Choice Vouchers administered by the Housing Authority. Each of these families is a member of Fall River Tenant Council. If the Rule and Birthright Guidance go into effect, these member families will be forced to either separate or give up their federally assisted homes.

188. In addition, Fall River Tenant Council members who are citizens or eligible noncitizens will be harmed by the new and onerous verification requirements the Rule and the Birthright Guidance each impose.

189. Many of these members, particularly those who are elderly, no longer have access to their birth certificates and do not have passports, meaning that they could not successfully prove eligibility for their housing under the Rule in the event they are required to undergo secondary verification.

190. Many of these households are extremely low-income and cannot afford the fees to replace a birth certificate or the cost of transportation for travel that might be necessary to obtain replacement documents.

191. A large share of Fall River Tenant Council members do not have internet access and would not be able to use online resources to request replacement documents.

192. It is also practically impossible for these individuals to access any Qualifying Parent Documentation contemplated by the Birthright Guidance, such as a parent's birth certificate. For example, Fall River Tenant Council's Chairman, a tenant in federal public housing in Fall River, was born in the United States, as were both his parents. The Chairman does not have a passport. He has his own birth certificate, but does not have his parents' birth certificates and would have to expend time and money to obtain these documents.

193. Separately, many Fall River Tenant Council members are elders who were born in the United States to parents who were naturalized U.S. citizens and would be required to obtain their parents' Certificates of Naturalization, which could be even more burdensome than pursuing birth certificates.

194. Fall River Tenant Council members who retain their federal housing benefits will also be harmed through the Rule's financial and administrative impacts upon the Housing Authority. As the Housing Authority will be required to replace formerly prorated households in its public housing and Section 8 portfolios with families who receive full subsidies, decreased funding will be available for maintenance, management, and subsidy administration at its properties. Additionally, the burdens of reverifying the status of existing households will impede Housing Authority staff from completing their day-to-day operations to keep its buildings maintained and provide timely voucher management services.

195. Because Fall River Tenant Council members rely on the Housing Authority to maintain their public housing units and administer their Section 8 vouchers, the negative impacts of the Rule and the Birthright Guidance upon the Housing Authority will, in turn, negatively impact Fall River Tenant Council members' quality of housing and overall quality of life.

196. In addition to harming Fall River Tenant Council members, the Rule and Birthright Guidance will also harm Fall River Tenant Council directly in the following ways:

(a) Because Fall River Tenant Council's mission is to provide resources and support to its members—a mission which necessarily involves assisting residents with day-to-day challenges they experience as residents of subsidized housing—the Rule and Birthright Guidance will effectively swamp Fall River Tenant Council staff, board members, and volunteers with tenant requests to assist with the verification requirements the Rule and Birthright Guidance impose. This will require Fall River Tenant Council to divert resources from its day-to-day tasks of working collaboratively with the Housing Authority to address questions and problems impacting Fall River Tenant Council members and the fear that members will face that they may lose their housing.

(b) Fall River Tenant Council will also be harmed by the loss of longstanding members, as mixed-status households—and fully eligible households who are not able to provide the kind of citizenship verification required by the Birthright Guidance—are removed from the Housing Authority's federal programs. For example, Fall River Tenant Council's Chairman sometimes relies on help from members of mixed-status families to help him with limited English proficient members. Furthermore, to the extent that the Housing Authority cannot reissue any of the terminated Section 8 vouchers due to funding shortfalls, there will be an immediate decrease

in total membership of Fall River Tenant Council due to the permanent loss of those vouchers from the Housing Authority's Section 8 program.

(c) Finally, the Rule and Birthright Guidance will inevitably cost Fall River Tenant Council money, given that: (1) Fall River Tenant Council's revenues are calculated based on the number of public housing units it represents; and (2) even according to HUD's own analysis, the Rule and Birthright Guidance will impose tremendous costs upon the Housing Authority that will reduce the number of assisted households within its federal public housing portfolio.

**3. *Border Workers United***

197. The Rule has negatively impacted and will continue to negatively impact BWU and its members. BWU does not track the immigration status of its members. But its survey shows that about 70% of BWU members belong to families that include both U.S. citizens and noncitizens. As a result, the Rule falls harshly on BWU's membership.

198. Member C has been a member of BWU for five years, and is a Latina, Mexican national, without eligible immigration status. Member C lives in Section 8 Project-Based housing in El Paso, Texas, with her five children. All of Member C's children are U.S.-born citizens, and several have disabilities. Her oldest, who is nineteen, is developmentally an eleven-year-old and requires around-the-clock care. Member C's sources of income derive from social security disability benefits and child support.

199. Because the Rule requires every member of an assisted household to declare and establish U.S. citizenship or eligible immigration status, and eliminates the option for a family member not to contend eligible status, Member C will lose her housing under the Rule unless she declares and proves eligible immigration status, which she cannot do. Since Member C cannot afford to pay market rate rent, she and her children—all of whom are U.S. citizens—face the risk of homelessness if the Rule takes effect.

200. Another BWU member, Member D, lives with her two U.S.-born children, ages 19 and 16, and her spouse in HUD-assisted housing administered by the Port Isabel Housing Authority. Member D and her spouse are Mexican nationals without eligible immigration status.

201. Because the Rule requires every member of an assisted household to declare and establish U.S. citizenship or eligible immigration status, and eliminates the option for a family member not to contend eligible status, Member D will lose her housing under the Rule unless she declares and proves eligible immigration status, which she cannot do. Her two children and their father cannot afford to pay market rate rent and risk homelessness if they lose their federally assisted home because of the Rule.

202. Many BWU members are afraid that they will be displaced or in the process of being displaced by the 90th day after the Rule takes effect. BWU members in mixed-status families are being forced to forgo necessities like food because they worry about saving enough money to find alternative market housing where rent is sometimes as high as four times the rent they pay in HUD housing.

203. The Rule harms BWU's members in mixed-status families. The Rule threatens to tear these families apart. It is forcing families to choose between separating from their children or moving their households, including U.S.-born children who are eligible for prorated housing assistance, out of their federally assisted homes.

204. By threatening to displace many BWU members 90 days after its effective date, the Rule also frustrates one of BWU's core pillars of work which is to promote housing stability and economic security for its membership.

**4. *Smith Houses Resident Association***

205. Plaintiff Smith Houses Resident Association (the "Resident Association") is a Resident Association serving public housing residents within the Smith Houses, a 1,931 unit public housing development on the East Side of Manhattan, New York.

206. The Resident Association is a membership-based organization made up of public housing residents of Smith Houses who are authorized residents and 18 years old and older.

207. The Resident Association is authorized to negotiate with the New York City Housing Authority ("NYCHA") as to all matters that impact its members.

208. The Resident Association's budget is generated primarily from tenant participation funds, which are authorized by New York State and federal regulations to support resident participation in the governance of public housing programs.

209. NYCHA disburses tenant participation funds to the Resident Association at a rate of $15.00 per occupied unit within Smith Houses per year.

210. The Resident Association's members are federal public housing tenants who will be subject to the Rule and the Birthright Guidance if they go into effect.

211. Currently, sixteen mixed-status families reside in Smith Houses and are federal public housing tenants of NYCHA.

212. If the Rule and the Birthright Guidance go into effect, these families will be forced to either separate or give up their federally assisted homes.

213. In addition, Resident Association members who are citizens or eligible noncitizens will be harmed by the new and onerous verification requirements the Rule and the Birthright Guidance each impose.

214. Many of these members, particularly those who are elderly, no longer have access to their birth certificates and do not have passports, meaning that they could not successfully prove

eligibility for their housing under the Rule in the event they are required to undergo secondary verification.

215. Many of these households are extremely low-income and cannot afford the fees to replace a birth certificate or the cost of transportation for travel that might be necessary to obtain replacement documents.

216. A large share of Resident Association members do not use the internet or lack internet access and would not be able to use online resources to request replacement documents.

217. It is also practically impossible for these individuals to access any Qualifying Parent Documentation contemplated by the Birthright Guidance, such as a parent's birth certificate.

218. Many Resident Association members are elders who were born in the United States to parents who were naturalized U.S. citizens and would be required to obtain their parents' Certificates of Naturalization, which could be even more burdensome than pursuing birth certificates.

219. Resident Association members who retain their federal housing benefits will also be harmed through the Rule's financial and administrative impacts upon NYCHA. As NYCHA will be required to replace formerly prorated households in its public housing and Section 8 portfolios with families who receive full subsidies, decreased funding will be available for maintenance, management, and subsidy administration at its properties. Additionally, the burdens of reverifying the status of existing households will impede NYCHA staff from completing their day-to-day operations to keep its buildings maintained and provide timely voucher management services.

220. Because Resident Association members rely on NYCHA to maintain their public housing units, the negative impacts of the Rule and the Birthright Guidance upon NYCHA will, in

turn, negatively impact Resident Association members' quality of housing and overall quality of life.

221. In addition to harming Resident Association members, the Rule and the Birthright Guidance will also harm the Resident Association directly in the following ways:

(a) Because the Resident Association's mission is to provide resources and support to its members—a mission which necessarily involves assisting residents with day-to-day challenges they experience as residents of subsidized housing—the Rule and the Birthright Guidance will effectively swamp Resident Association board members and volunteers with tenant requests to assist with the verification requirements the Rule and the Birthright Guidance impose. This will require the Resident Association to divert resources from its day-to-day tasks of working collaboratively with NYCHA to address questions and problems impacting Resident Association members and the fear that residents will face that they may lose their housing.

(b) The Resident Association will also be harmed by the loss of longstanding residents, as mixed-status households—and fully eligible households who are not able to provide the kind of citizenship verification required by the Birthright Guidance—will be evicted from NYCHA's public housing programs.

(c) Finally, the Rule and the Birthright Guidance will inevitably cost the Resident Association money, given that: (1) the Resident Association's revenues are calculated based on the number of public housing units it represents; and (2) even according to HUD's own analysis, the Rule and Birthright Guidance will impose tremendous costs upon NYCHA that will reduce the number of assisted households within its federal public housing portfolio.

### B. Individual Plaintiffs

#### 1. *Jane Doe #1*

222. Plaintiff Jane Doe #1 is a foreign-born resident of the United States who has been living in the United States since 2015. She is currently authorized to live and work here.

223. Jane Doe #1's current immigration status is not an "eligible" status under Section 214 for housing subsidies.

224. Jane Doe #1 currently lives with her four children, all of whom are age 12 or under. Her oldest child has the same immigration status as Jane Doe #1. Her three younger children are U.S. citizens.

225. The family lives together in an apartment with the assistance of a subsidy under Section 8.

226. Because Jane Doe #1 and her eldest child "do not contend" that their immigration status makes them ineligible for federal housing benefits, their assistance is prorated such that they receive 60% of the benefit for which they would otherwise be eligible.

227. Under the mixed-status rule challenged in this case, the family would lose their housing subsidy entirely. Because Jane Doe #1's citizen children cannot live independently from her, the family would face eviction and homelessness.

#### 2. *Jane Doe #2*

228. Plaintiff Jane Doe #2 is the primary caregiver for her three daughters. Her middle daughter is on the autism spectrum and needs assistance with daily activities; Jane Doe #2 is responsible for managing the services her daughter receives from the New York State Office for People with Developmental Disabilities and cares for her daily. Her oldest daughter has asthma. Jane Doe #2 is primarily responsible for managing her daughters' health conditions, taking them

to medical appointments and school, and cooking, cleaning, and caring for them. Jane Doe #2 herself suffers from lupus, chronic pain, arthritis, anxiety, and depression.

229. Jane Doe #2's husband is the head of household on the family's lease, and Jane Doe #2 is the co-head of household. The household currently pays $1,830 of the $1,900 monthly contract rent. Jane Doe #2's husband works in maintenance and is the family's sole provider. Jane Doe #2 is unable to work because an occupational accident left her with debilitating back and shoulder pain.

230. Because the Rule requires every member of the household to declare and establish U.S. citizenship or eligible immigration status, and eliminates the option for a family member not to contend eligible status, the Rule will deny Jane Doe #2's family the ability to remain together in their home. Although the family pays nearly the full contract rent, the Rule would disqualify Jane Doe #2 from living in the family's project-based Section 8 housing irrespective of the financial subsidy.

231. Separating from her daughters is not an option for Jane Doe #2. If Jane Doe #2 cannot remain in the apartment, her entire family—including her three U.S.-citizen daughters, who are eligible for federally assisted housing—will be forced to leave. The family cannot afford market-rate housing for a household of their size in New York City nor can the family afford to relocate from New York City, where her daughters' educational, medical, and mental health needs are being met.

232. The threat of losing her home and being separated from her children has caused Jane Doe #2 severe stress on top of caring for her daughters and managing her own health conditions.

### 3. *Jane Doe #3*

233. Plaintiff Jane Doe #3 is a foreign-born resident of the United States who lives and works in the United States.

234. Jane Doe #3 does not currently have an immigration status that is "eligible" for federal financial assistance under Section 214.

235. Jane Doe #3 and her family reside in a dwelling unit that is subsidized by a Section 214-covered program. Without the subsidy, the family would not be able to afford the housing.

236. Jane Doe #3's household includes herself and her five children, all of whom are U.S. citizens. Four of the children are age 15 or under. Her oldest child is in college and spends extensive time outside the residence when classes are in session.

237. Because Jane Doe #3 "does not contend" that she has an immigration status that makes her ineligible for federal housing benefits, the family's assistance is prorated such that they receive 5/6 of the federal financial assistance the household would receive if fully eligible.

238. Under the mixed-status rule challenged in this case, the family would lose their housing subsidy entirely if Jane Doe #3 were to remain in the household. Without the subsidy, the entire family would face eviction and homelessness.

239. If Jane Doe #3 were to leave the household, her U.S. citizen children could retain the HUD financial assistance—but Jane Doe #3 has nowhere to go and would face homelessness. Also, Jane Doe #3's four younger children are not able to live independently. Her oldest child would therefore likely be forced to leave university and live full-time at home to care for the younger siblings.

## CLASS ALLEGATIONS

240. Plaintiffs Jane Doe #1, Jane Doe #2, and Jane Doe #3 (the "Class Representative Plaintiffs") bring this action under Federal Rule of Civil Procedure 23(a) and 23(b)(2) on behalf

of themselves and on behalf of a nationwide class of all other persons similarly situated, defined as:

> All current or future persons who are members of a mixed-status household applying for or receiving federal housing assistance under programs covered by Section 214 of the Housing and Community Development Act of 1980.

**A. Rule 23(a) Requirements Are Met**

241. The class satisfies the numerosity, commonality, typicality, and adequacy prerequisites of Rule 23(a).

**1. *Numerosity***

242. The proposed class satisfies the numerosity requirements of Fed. R. Civ. P. 23(a)(1) because the proposed class is so numerous that joinder of all members is impracticable. The Rule denies housing benefits to all persons in a mixed-status household. According to HUD's own analysis, the challenged rule would impact almost 80,000 individuals in mixed-status families nationwide, including approximately 36,000 eligible children. *See* 2025 RIA at 9, 46 n.71. The precise number of class members can be ascertained from the records of HUD, local public housing agencies, and owners/subsidy administrators of properties in the Project-Based Rental Assistance program.

243. Joinder is also impracticable because the class is geographically dispersed across the United States.

**2. *Commonality***

244. The class meets the commonality requirements of Fed. R. Civ. P. 23(a)(2). All members of the proposed class are subject to common practices set out by the Rule and the Birthright Guidance: the categorical denial of federal housing benefits in mixed-status families and the potential loss of housing in the absence of documentation that is impracticable to obtain and in violation of the statute. This action also raises questions of law common to the proposed

class, including whether the challenged Rule and the Birthright Guidance violate Section 214 of the Housing and Community Development Act of 1980 ("HCDA"); whether they violate the APA by being arbitrary, capricious, contrary to law, or in excess of statutory authority; and whether the Rule violates the constitutional rights of U.S. citizen children and eligible noncitizen family members in mixed-status families.

**3. *Typicality***

245. The proposed class meets the typicality requirements of Fed. R. Civ. P. 23(a)(3) because the claims of the Class Representative Plaintiffs are typical of the claims of the class. The Class Representative Plaintiffs and class members are all subject to the same challenged Rule and face the same risk of denial, reduction, or termination of housing assistance, eviction, family separation, or other harms as a result of the Rule's requirements. The injuries suffered by the Class Representative Plaintiffs arise from the same course of conduct by Defendants as the injuries suffered by the class as a whole.

**4. *Adequacy***

246. The proposed class meets the adequacy requirements of Fed. R. Civ. P. 23(a)(4). The Class Representative Plaintiffs seek the same relief as the other members of the class—among other things, a declaratory judgment that the Rule is unconstitutional and violates the APA, and a permanent injunction against that Rule. In defending their rights, Class Representative Plaintiffs will defend the rights of all proposed class members fairly and adequately. The Class Representative Plaintiffs are members of the class, and their interests do not conflict with those of the other class members.

247. The proposed class is represented by experienced attorneys from Greater Boston Legal Services, the Legal Aid Society, LatinoJustice PRLDEF, National Housing Law Project, the Massachusetts Law Reform Institute, and Winston Taylor LLP (collectively, "Proposed Class

Counsel"). Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens and individuals challenging government actions. Collectively, they also have decades of experience in housing law including, without limitation, laws governing public and subsidized housing. The interests of the members of the class will be fairly and adequately protected by the Class Representative Plaintiffs and their attorneys.

**B. Rule 23(b)(2) Requirements Are Met**

248. The proposed class also satisfies Fed. R. Civ. P. 23(b)(2). Defendants have acted or refused to act on the same unlawful grounds that apply generally to the class, so that final injunctive and declaratory relief is appropriate respecting the class as a whole. The challenged Rule is a uniform federal policy that applies to all mixed-status families seeking or receiving federal housing assistance, and its enforcement threatens the rights and interests of all class members in the same manner. Injunctive and declaratory relief is therefore appropriate with respect to the class as a whole.

## CAUSES OF ACTION

### COUNT ONE
### Violation of the APA, 5 U.S.C. § 706(2)(A), (B), (C), Contrary to Law and the Constitution and in Excess of Statutory Authority

249. Plaintiffs reallege and incorporate by reference the allegations of fact in each of the preceding paragraphs of this Complaint.

250. HUD's promulgation of the Rule and the Birthright Guidance constitutes final agency action reviewable under 5 U.S.C. § 704.

251. The APA authorizes a person aggrieved or adversely affected by final agency action to bring an action for judicial review. *See* 5 U.S.C. § 702.

252. The APA empowers federal courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(A), (C). Agency action is also invalid if it is "contrary to constitutional right, power, privilege, or immunity." *Id.* § 706(2)(B).

253. The Rule and the Birthright Guidance directly conflict with the plain text and statutory scheme of Section 214 of the Housing and Community Development Act of 1980, as amended (42 U.S.C. § 1436a), in several fundamental respects, as described more fully above. Among other things, the Rule and the Birthright Guidance:

- eliminate prorated assistance for mixed-status families in direct conflict with the statutory mandate that financial assistance "shall be prorated" to such families, 42 U.S.C. § 1436a(b)(2);
- dismantle the "do not contend" provision that Congress enacted to enable mixed-status families to remain together in HUD-assisted housing;
- eliminate the statutory exemption for noncitizens age 62 and older from immigration documentation requirements;
- unlawfully expand the use of SAVE beyond Congress's authorization to verify U.S. citizenship;
- eliminate the statutorily required DHS appeal procedure for noncitizens whose eligibility is not verified through SAVE;
- convert the discretionary verification of U.S. citizens' eligibility into a mandatory, universal requirement exceeding what the statute authorizes; and
- impose unauthorized penalty and reporting requirements on private owners of HUD-assisted housing.

254. The Rule and the Birthright Guidance are fundamentally inconsistent with the statutory scheme established by Section 214, as was enacted and repeatedly amended by Congress, with the goal of limiting federal housing assistance to eligible persons while protecting family integrity and assuring "that families in which at least one person is eligible are not disqualified." H.R. Rep. No. 100-122, at 50 (1987).

255. The statutory text of Section 214 establishes that HUD's Rule and the Birthright Guidance exceed its authority.

256. The Rule and the Birthright Guidance also violate the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq*. because they intentionally discriminate against individuals and families based on race, color, and/or national origin, as set forth in Section II.F, *supra*. They also have an impermissible disparate impact on such individuals. Under 42 U.S.C. § 3608(e)(5), HUD has an affirmative duty to "administer the programs and activities relating to housing and urban development in a manner" consistent with the nation's anti-discrimination laws.

257. The Rule and the Birthright Guidance violate the Constitution as set forth in Counts Four and Five, *infra*.

258. The Court should vacate the Rule and the Birthright Guidance under 5 U.S.C. § 706(2)(A), (B), and (C) because they are not in accordance with law and are in excess of statutory authority and/or because they violate the Constitution.

**COUNT TWO**
**Violation of the APA, 5 U.S.C. § 706(2)(A) –**
**Arbitrary, Capricious, and an Abuse of Discretion**

259. Plaintiffs reallege and incorporate by reference the allegations of fact in each of the preceding paragraphs of this Complaint.

260. The APA empowers federal courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

261. The Rule and the Birthright Guidance are arbitrary, capricious, and an abuse of discretion for, without limitation, the following reasons:

- They constitute an unexplained departure from 30 years of consistent agency policy maintaining Section 214's protections for prorated assistance to mixed-status families, without any valid reasoned explanation for the reversal;
- HUD has not identified any meaningful benefit the Rule and the Birthright Guidance will accomplish, and its stated justifications are pretextual, contradicted by HUD's own analysis, or otherwise without evidentiary support;
- HUD failed to consider critical impacts, including:
  - whether affordable housing exists for displaced families;
  - the reliance of families on the mixed-status framework, which has been in place for three decades;
  - the secondary effects of displacement;
  - the accuracy and reliability of SAVE for verifying U.S. citizenship; and
  - the lack of evidence of fraud justifying new verification requirements;
- HUD failed to consider less harmful alternatives before promulgating the Rule and the Birthright Guidance;
- HUD adopted the Rule without giving due consideration to the overwhelmingly opposed comments raising concerns about family separation, exacerbation of the housing crisis, harm to seniors and persons with disabilities, and the absence of any demonstrated regulatory failure;

- The Rule and the Birthright Guidance impose significant unfunded administrative mandates on public housing agencies and subsidized owners without corresponding funding; and
- HUD failed to adequately assess the drastic costs of the Rule and the Birthright Guidance, which vastly outweigh any purported benefits, as described more fully above, including displacement and separation of mixed-status families, the exacerbation of the affordable housing crisis, and increasing costs associated with the new documentation and verification requirements.

262. The Court should vacate the Rule and the Birthright Guidance under 5 U.S.C. § 706(2)(A) because they are arbitrary, capricious, and an abuse of discretion.

**COUNT THREE**
**Violation of the APA, 5 U.S.C. §§ 553, 706(2)(D) –**
**Failure to Observe Required Procedure**

263. Plaintiffs reallege and incorporate by reference the allegations of fact in each of the preceding paragraphs of this Complaint.

264. The APA directs federal courts to hold unlawful and set aside agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

265. HUD promulgated the Rule and the Birthright Guidance without observance of procedures required by law, including with respect to the Regulatory Flexibility Act (5 U.S.C. § 603), Executive Order 13132 (64 Fed. Reg. 43,255 (Aug. 10, 1999)), and the Unfunded Mandates Reform Act (2 U.S.C. §§ 1531–1538).

266. HUD failed to observe the procedures of the Regulatory Flexibility Act because no regulatory flexibility analysis was prepared or made available for public comment.

267. HUD violated Executive Order 13132 because it has not prepared or published a federalism impact statement despite the substantial compliance costs imposed on public housing agencies.

268. HUD has not prepared an adequate cost-benefit analysis as required under the Unfunded Mandates Reform Act.

269. The Birthright Guidance was issued after the notice and comment period for the Rule had ended.

270. HUD did not properly consider the impact of the Birthright Guidance on benefit recipients, offer any opportunity for notice and comment on the Birthright Guidance, or comply with any other required procedure mandated by the APA.

271. The Court should vacate the Rule and the Birthright Guidance under 5 U.S.C. § 706(2)(D) because they were promulgated without observance of procedures required by law.

**COUNT FOUR (IN THE ALTERNATIVE)**
**Violation of the Fifth Amendment –**
**Due Process, Infringement of the Fundamental Right to Family Integrity**

272. Plaintiffs reallege and incorporate by reference the allegations of fact in each of the preceding paragraphs of this Complaint.

273. The Rule violates the substantive due process protections of the Fifth Amendment because it infringes on the fundamental right to family integrity.

274. For the approximately 70% of mixed-status families composed of eligible children and at least one ineligible parent, the Rule means that one or both parents could be forced from the home, severing the parent-child bond. Of the nearly 80,000 individuals living in mixed-status HUD-assisted households, approximately 36,000 are eligible children, which include U.S. citizen children, who face family separation or homelessness despite bearing no responsibility for a family member's immigration status.

275. The Rule targets approximately 36,000 eligible children, including U.S. citizen children, for constructive separation from their parents. The compressed timelines and elimination of appeal rights suggest a punitive or deterrent purpose rather than a legitimate verification objective. HUD has made no apparent effort to alleviate the resultant harm to affected children. The government's asserted justification of verifying eligibility for federal housing assistance does not require the total elimination of protections for these families, as the prior regulatory framework accomplished the stated goal while preserving family unity through prorated assistance.

276. The Rule is not narrowly tailored to achieve any compelling governmental interest.

**COUNT FIVE (IN THE ALTERNATIVE)**
**Violation of the Fifth Amendment –**
**Equal Protection Based on Discriminatory Animus**

277. Plaintiffs reallege and incorporate by reference the allegations of fact in each of the preceding paragraphs of this Complaint.

278. The Rule violates the equal protection guarantee of the Fifth Amendment's Due Process Clause because it was motivated by discriminatory animus against a protected class, immigrants of color, particularly Latino communities.

279. Discriminatory intent is evidenced by the following, among other things:

- <u>Impact</u>: Approximately 85%–90% of individuals in mixed-status families affected by the Rule are of Latin American heritage, though Latino individuals comprise only 20% of overall HUD assistance recipients. The Rule will impact Latin Americans at a rate approximately 24 times higher than members of other racial and ethnic groups. This discriminatory effect is known to Defendants and intended by the policymakers who directed this rulemaking; and

- Contemporary Statements by Decisionmakers: The Rule was announced under the headline, "Illegals, Ineligibles, and Fraudsters: Pack Your Bags," and Secretary Turner, who signed the Rule, described it as "finally ending this gravy train for illegals," declared that "[i]llegal aliens have no place in public housing," and testified that families affected by the Rule are "making the decision . . . to game the system." The Rule was further issued against a backdrop of extensive, documented anti-immigrant statements by President Trump and senior officials reflecting specific hostility toward immigrants from Latin American, African, and Asian countries.

280. The Rule also impermissibly excludes eligible U.S. citizen children from HUD-assisted housing programs when they reside in households with an ineligible adult member, intentionally discriminating between U.S. citizen children in mixed-status families and those who are not. HUD has offered no legitimate government purpose furthered by this distinction.

## PRAYER FOR RELIEF

Wherefore, the Plaintiffs respectfully request that this Court grant the following relief:

A. Enter a declaratory judgment that the Rule and the Birthright Guidance are arbitrary and capricious, an abuse of discretion or contrary to law, and without observance of procedure required by law;

B. Issue preliminary and permanent injunctions precluding the implementation or enforcement of the Rule and the Birthright Guidance;

C. Stay and vacate the Rule and the Birthright Guidance and set them aside under 5 U.S.C. §§ 705 and 706, respectively;

D. Direct HUD to take all affirmative steps necessary to remedy the effects of the illegal conduct described herein and to prevent similar occurrences in the future;

E. Certify a Class under Fed. R. Civ. P. 23 and provide that any relief the Court

awards is applicable to members of that Class;

F. Award Plaintiffs their reasonable attorneys' fees and costs; and

G. Order such other relief as this Court deems just and proper.

**Dated:** November 19, 2026

Respectfully submitted,

By: *<u>/s/ John D. Mitchell</u>*
John D. Mitchell

**WINSTON TAYLOR LLP**
John D. Mitchell (BBO 662806)
300 N. LaSalle Dr.
Chicago, IL 60654
Tel: (312) 558-1656
john.mitchell@winstontaylor.com

Jeffrey L. Kessler*
Jeffrey J. Amato*
Kerry C. Donovan*
Adam P. Moskowitz*
Neha Vyas*
Isabella L. Caito*
200 Park Avenue
New York, NY 10166
Tel: (212) 294-4633
jeffrey.kessler@winstontaylor.com
keffrey.amato@winstontaylor.com
kerry.donovan@winstontaylor.com
adam.moskowitz@winstontaylor.com
neha.vyas@winstontaylor.com
isabella.caito@winstontaylor.com

**LATINOJUSTICE PRLDEF**
Francisca D. Fajana (BBO 564301)
Namratha Somayajula*
475 Riverside Drive, Suite 1901
New York, NY 10115
Tel: (212) 219-3360
ffajana@latinojustice.org
nsomayajula@latinojustice.org

**NATIONAL HOUSING LAW PROJECT**
Eric Dunn*
90 New Montgomery Street, Ste. 1015
San Francisco, CA 98105
(Based in Richmond, Virginia)
Tel: (206) 914-3798
edunn@nhlp.org

**THE LEGAL AID SOCIETY**
Judith Goldiner*
Lucy Newman*
49 Thomas Street, Floor 5
New York, NY 10013
Tel: (212) 577-3300
jgoldiner@legal-aid.org
lcnewman@legal-aid.org

**GREATER BOSTON LEGAL SERVICES, INC.**
Gary Klein (BBO 560769)
Joseph Michalakes (BBO 696740)
Laura Massie (BBO 673301)
197 Friend Street
Boston, MA 02114
Tel: (617) 320-8397
gklein@gbls.org
jmichalakes@gbls.org
lmassie@gbls.org

**MASSACHUSETTS LAW REFORM INSTITUTE**
Annette Duke (BBO 545079)
Ben Levine (BBO 710365)
40 Court Street, #700
Boston, MA 02108
Tel: (617) 357-0700
aduke@mlri.org
blevine@mlri.org

*Counsel for Plaintiffs*

*Pro Hac Vice Admission forthcoming*